# EXHIBIT 1

R.R.,

       Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

       Defendant.

_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

# DOCKET SHEET

# MIKE CARUSO
### CLERK OF THE CIRCUIT COURT & COMPTROLLER
### PALM BEACH COUNTY

**CASE NUMBER: 50-2025-CA-008675-XXXA-MB**
**CASE STYLE: CONFIDENTIAL PARTY V CPLG WEST PALM BEACH LLC**
ACCESS LEVEL: D

| Search Criteria | Search Results | Case Info | Party Names | Dockets & Documents | Case Fees | Court Events |
|---|---|---|---|---|---|---|

View documents and order certified copies*. See our eCaseView FAQ for step-by-step guidance and information about what documents are available online.

**Document Icons**

📄 Document available. Click icon to view.

🛒 Add a certified copy of the document to your shopping cart.

🔒 Document is Viewable on Request (VOR). Click to request.

⏱ VOR document is being reviewed. Click to be notified when available.

**0**

Public = 📄          VOR = 🔒          In Process = ⏱          Page Size: 50

| | | DIN | Effective Date | Description | Notes |
|---|---|---|---|---|---|
| 📄 | 🛒 | 2 | 08/26/2025 | CIVIL COVER SHEET | |
| 📄 | 🛒 | 3 | 08/26/2025 | COMPLAINT | F/B PLT |
| 📄 | 🛒 | 4 | 08/26/2025 | MOTION FOR ORDER | FOR PROTECTIVE ORDER AND LEAVE TO PROCEED VIA INITIALS WITH BRIEF IN SUPPORT F/B PLT |
| | | 1 | 08/27/2025 | DIVISION ASSIGNMENT | AD: Circuit Civil Central - AD (Civil) |
| 📄 | 🛒 | 5 | 08/27/2025 | PAID $401.00 ON RECEIPT 5927107 | $401.00 5927107 Fully Paid |
| 📄 | 🛒 | 6 | 08/27/2025 | DCM DESIGNATION TO THE GENERAL TRACK WITH JURY TRIAL ORDER | JAIMIE R. GOODMAN 08/27/2025 |



| | | 7 | 08/27/2025 | ~~CORRECT AND RESUBMIT SUMMONS NOT ISSUED PURSUANT TO ADMINISTRATIVE ORDER NO. 2.207, ALL SUMMONSES, COMMUNICATIONS NOTICING COURT PROCEEDINGS, PROCEEDINGS BEFORE GENERAL MASTERS, AND MEDIATION PROCEEDINGS SHALL INCLUDE THE FOLLOWING LANGUAGE ADA-NOTICE.PDF (15THCIRCUIT.COM). | anthony@victimsvoice.law;VV.001@Victimsvoice.law;Pleadings@victimsvoice.law PURSUANT TO ADMINISTRATIVE ORDER NO. 2.207, ALL SUMMONSES, COMMUNICATIONS NOTICING COURT PROCEEDINGS, PROCEEDINGS BEFORE GENERAL MASTERS, AND MEDIATION PROCEEDINGS SHALL INCLUDE THE FOLLOWING LANGUAGE ADA-NOTICE.PDF (15THCIRCUIT.COM). |
| | | 8 | 09/02/2025 | PAID $10.00 ON RECEIPT 5933657 | $10.00 5933657 Fully Paid |
| | | 9 | 09/02/2025 | NOTICE OF SIMILAR CASES FILED BY PLT | OF SIMILAR CASES FILED BY PLT |
| | | 10 | 09/02/2025 | SUMMONS ISSUED | anthony@victimsvoice.law;VV.001@Victimsvoice.law;Pleadings@victimsvoice.law AS TO DFT CPLG WEST PALM BEACH LLC |
| | | 11 | 10/28/2025 | SERVICE RETURNED (NUMBERED) | RETURN OF SERVICE SERVED CPLG WEST PALM BEACH L.L.C - 10/16/2025 |

517-60a7692f-2167-4618-8a34-7b128ad85759

R.R.,

   Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

   Defendant.
_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

# CIVIL COVER SHEET

# FORM 1.997.    CIVIL COVER SHEET

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

## I.    CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>FIFTEENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>PALM BEACH</u>   COUNTY, FLORIDA

███

Plaintiff                                          Case # _____
                                                   Judge  _____

vs.

<u>CPLG WEST PALM BEACH LLC</u>
Defendant

## II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

## III.    TYPE OF CASE     (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

NOT A CERTIFIED COPY

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☒ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☒ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☐ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**    **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**    **NUMBER OF CAUSES OF ACTION:** [  ]
(Specify)

  2

**VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ yes
☒ no

**VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☐ no
☒ yes If "yes," list all related cases by name, case number, and court.
    ████ v. BRE/Florida Wellesley L.L.C., et al; ████ v. CPLG West Palm Beach L.L.C.; ████ v. Motel 6 Operating L.P., et al; ████ v. West Palm Hotel Holdings, Inc., et al.; ████ v. G6 Hospitality Property LLC

**VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
☒ yes
☐ no

**IX.**    **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
☒ yes
☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ ANTHONY CHIARELLO      Fla. Bar # 73760
         Attorney or party             (Bar # if attorney)

ANTHONY CHIARELLO                  08/26/2025
   (type or print name)                        Date



R.R.,

       Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

       Defendant.

_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

# COMPLAINT

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

███

           Plaintiff,

CASE NO. _____

v.

CPLG WEST PALM BEACH L.L.C.,
a Delware limited liability company,

           Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, ███ by and through undersigned counsel, hereby files her Complaint against

Defendant, CPLG WEST PALM BEACH L.L.C., and as grounds therefore states as follows:

### INTRODUCTION

1. This is an action for damages in excess of Fifty Thousand Dollars ($50,000.00).

2. This action for damages is brought by the Plaintiff, ██RED██ a survivor of sex trafficking,
   under Florida State Law as well as the federal William Wilberforce Trafficking Victims
   Protection Reauthorization Act of 2008 (hereinafter the "TVPRA").

3. R.R. files this civil lawsuit seeking compensation for the harm she suffered when she was
   forcibly sex-trafficked in a hotel owned, operated, maintained, and controlled by
   Defendant, it's owners, managers, employees and agents.

4. Defendant, CPLG WEST PALM BEACH L.L.C., (collectively with their managers,
   employees and agents who, for the remainder of this complaint, always acted the course
   and scope of their employment and for the benefit of the La Quinta Inn by Wyndham Hotels
   & Resorts, shall be referred to as the "Harboring Defendant") owned and managed the La

---

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

1

Quinta Inn where Plaintiff, ███ was trafficked, located 5981 Okeechobee Blvd, West Palm Beach, FL 33417, between September of 2006 and March of 2022; changing its name from LQ West Palm Beach L.L.C. to CPLG West Palm Beach L.L.C. in 2018.

5. The Harboring Defendant, through its owners, operators, managers, supervisors and employees controlled, operated and were responsible for the La Quinta Inn described above where Plaintiff, ███, was trafficked.

6. As described below ███ was forcibly sex trafficked as a direct result of a joint business venture between Plaintiff's sex trafficker and the Harboring Defendant who purposely and knowingly cooperated with and participated in this sex trafficking enterprise. ███ s trafficker purposely chose this hotel to sex traffic REL because he knew his commercial sex trafficking enterprise would be facilitated by the cooperation of the Harboring Defendant, and by his prior relationship with the Harboring Defendant at the La Quinta Inn hotel.

7. For approximately 6 years, from 2009 through 2015 REL just a 16-year-old girl, was repeatedly trafficked for sex at the La Quinta Inn by her trafficker "Zaya" and his associates.

## SEX TRAFFICKING IN THE TVPRA

8. According to the TVPRA "[a]t least 700,000 persons annually, primarily women and children, are trafficked within or across international borders. Approximately 50,000 women and children are trafficked into the United States each year."

9. The stated purpose of the TVPRA is "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."

▪ **VICTIM'S VOICE, LLC** ▪

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

10. Sex trafficking is defined in the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion or in which the person induced to perform such act has not attained 18 years of age."

11. Recognizing that criminal penalties for pimps and sex buyers were insufficient, Congress passed Section 1591 of the TVPRA which provides a civil remedy against everyone "involved" in the sex trafficking enterprise, specifically including hotels like the Harboring that harbored ████ for sex trafficking purposes.

12. Under the TVPRA, every entity who knowingly harbors another for a commercial sex act that was provided through force, fraud, and coercion or from any person, or merely induced to provide same from a person under the age of 18 years old, are guilty of sex trafficking; again, this includes the Harboring Defendant's hotel and others like it.

13. Further, any person who knowingly benefits from a commercial sex trafficking enterprise based on forced sex trafficking is jointly and severally liable for the damages arising from said trafficking.

14. R.R. was one of the 50,000+ victims of this form of sex slavery and a victim of sex trafficking within the meaning of the TVPRA.

15. The Harboring Defendant's cooperation with ███'s traffickers, as described herein, constitutes a violation of the TVPRA, and ████ would not have been trafficked without the acts and omissions of Harboring Defendant.

16. ████ brings this civil action under 18 U.S.C. §1595 seeking recovery for six years of forced sex slavery at the La Quinta Inn, with the cooperation and participation of the Harboring

Defendant.

## HARBORING DEFENDANT VIOLATED THE TVPRA

17. Forced sex trafficking of people like ███ is prevalent throughout the United States because hotels like the La Quinta Inn provide a non-traceable, low-overhead, low-risk commercial enterprise for sex traffickers.

18. Hotels like the La Quinta Inn also provide easy access, anonymity, privacy, and discretion for buyers and, with a hotel's participation, such an enterprise can remain hidden from law enforcement.

19. The TVPRA put the La Quinta Inn on notice of the high likelihood of sex trafficking occurring on their hotel premises.

20. Furthermore, Wyndham Hotels & Resorts (the franchisor of the La Quinta Inn) is a signatory to the Child Protection Code of Conduct ("The Code") established in 2004 (https://thecode.my.salesforce-sites.com/apex/LCRProfile1?country=USA), so it explicitly adhered to a set of codes that put it on notice of ███s sex trafficking; sadly, had it complied with The Code, RED would never have been harbored at their hotel.

21. Upon information and belief, the La Quinta Inn had policies and procedures designed to identify and report the obvious signs of sex trafficking, so the Harboring Defendant was well-aware of the violence, manipulation, lies, debt bondage, physical restraint, drugs, and coercion used to force RED into sex trafficking.

22. Based on its sex-trafficking policies and a combination of well-documented indicators, the Harboring Defendant knew or should have known that ███ was being sex trafficked at its hotel, but it chose to ignore these indicators and eschew its own policies; rather, the Harboring Defendant cooperated with ███s Traffickers to traffic ███ for profit.

23. At all material times, the Harboring Defendant, individually and collectively through its agents, employees, and franchisees, aided, abetted, concealed, confined, benefitted, harbored and profited from ███s sex trafficking at its hotel through a venture with Plaintiff's Traffickers, which caused ███ foreseeable and catastrophic damages.

## SEX TRAFFICKING VENTURE UNDER THE TVPRA

24. A sex trafficking venture under the TVPRA is the participation in a common sex trafficking enterprise that involves risk and potential profit. (*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021))

25. The Harboring Defendant participated in a common sex trafficking venture with ███'s traffickers where, together, they minimized their risks and maximized their profits.

26. The Harboring Defendant maximized profits from increased room occupancy, increased franchise royalty fees, increased property value, on-site food and beverage and condom sales, ATM fees, bribes, kickbacks, tips, drugs, sexual favors and other remuneration brought in by ███'s traffickers and the "Johns" that visited the hotel; simply put, participation with RED's Traffickers helped keep the hotel full.

27. In return, the Harboring Defendant created an environment where ███ could be sex trafficked out of the public view and away from prying eyes of law enforcement; this environment was specifically designed to chill any actions that might interfere with the trafficking of (people like) RE█ at the subject hotel.

28. Harboring Defendant purposely chose not to implement its own sex trafficking policies, educational or training programs, and they purposely chose not to implement policies (or they chose to violate the policies they had) that would have identified, reported, documented, investigated, prevented or ended the sex trafficking at the hotel; this is

especially egregious as its policies were designed to prevent sex trafficking and provide safe lodging.

29. Harboring Defendant willfully created an environment where a sex-trafficking venture flourished, it did flourish, they knew it flourished, and, as a result, ███ was trafficked at the La Quinta Inn.

30. Furthermore, Harboring Defendant's participation in this this sex-trafficking enterprise was through the acts of its owners, employees, and agents acting within the scope and course of their employment for the benefit of the Harboring Defendant.

31. As a direct and proximate result of the Harboring Defendant's cooperation, willful blindness, negligence, facilitation, malfeasance, and consistent refusals to adhere to common sense policies that would have eliminated human trafficking at the subject hotels, 15-year old ███ was drugged, starved, beaten, sold, assaulted, abused, and repeatedly raped, in a joint venture between her sex traffickers and the Harboring Defendant at the subject hotels in violation of the TVPRA.

## JURISDICTION AND VENUE

32. This Honorable Court has jurisdiction and venue over this matter because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Palm Beach County, Florida and Defendant's primary place of business was in Palm County, Florida at all relevant times.

## PARTIES

**I.  Plaintiff,** ███

33. Plaintiff, ███ is a Florida resident and is otherwise *sui juris*. She may be contacted through her lead counsel, whose information is contained below.

▪ **VICTIM'S VOICE, LLC** ▪
**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**
6

34. ███ is a victim of sex trafficking under the TVPRA because she was harbored, transported, or provided and forced to commit a commercial sex act at the subject hotel located at address described above from 2009 until December of 2015.

35. Given the nature of the case, ███ is identified in this Complaint by a fictitious name to prevent public disclosure. Plaintiff's counsel has either previously disclosed full names to defense counsel or will do so immediately upon identification of defense counsel.

36. When filing this Complaint, Plaintiff's counsel also filed a Motion for Protective Order seeking Court permission for Plaintiff to proceed anonymously.

**II. CPLG West Palm Beach L.L.C.**

37. CPLG West Palm Beach L.L.C. is a Delaware limited liability company authorized to do, licensed to do, and was doing business at its principal place of business, in Palm Beach County, in the State of Florida offering the harboring hotel as a place of public lodging; Defendant owned the La Quinta Inn by Wyndham Hotels & Resorts located at 5981 Okeechobee Blvd, West Palm Beach, FL 33417 ("La Quinta Inn") between September 2006 and March 2022.

38. All references to Harboring Defendant include any and all departments, divisions, offices, agencies, subsidiaries, or corporate affiliates, whether domestic, foreign, and/or international. These references also include any and all directors, officers, agents (either with direct/actual or implied/apparent authority), employees, persons, firms, or franchisors, who have taken any action or committed any omission on behalf of Harboring Defendant now or at any time relevant to the claims herein.

39. Any and all references to the actions or omissions by Harboring Defendant (either with direct/actual or implied/apparent authority) are specifically alleged to have been taken or

omitted in the course and scope of said person's employment or agency and for the benefit of the Defendant, and were the kind of services they were employed to perform; their services were provided substantially within both the time and space limits of their employment; and they were motivated, at least in part, by a purpose to serve and benefit their employers.

40. Based upon information and belief, at all relevant times, La Quinta Inn is a motel branded by Wyndham Hotels & Resorts and has been owned and/or operated and/or managed by or through Wyndham Hotels & Resorts, since at least 2006.

41. Harboring Defendant directly participated in a commercial venture that included the harboring and forced trafficking of █RED/ therefore becoming a perpetrator of her sexual trafficking under the TVPRA.

42. Harboring Defendant knowingly benefitted from this sexual trafficking enterprise in which they knew or should have known that Plaintiff was being sexually trafficked against her will.

## BACKGROUND AND FACTS

### La Quinta Inn Had Knowledge of Sex Trafficking

43. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Harboring Defendant knew or should have known regarding the forced sex-trafficking of ████ at the harboring hotel.

44. Today, sex slavery is pervasive in the United States, and hotels are the primary place

where it happens.[1] This is no accident. For years, sex traffickers have been able to reap

enormous profits with "little risk when attempting to operate within hotels."[2] In 2014, 92

percent of calls to the Human Trafficking Hotline involved reports of sex trafficking

taking place at hotels.[3] Hotels have been found to account for over 90 percent of

commercial sexual exploitation of children.[4]

45. Because of this link between hotels and sex trafficking, government agencies and non-

profits have devoted significant efforts to educating the hotel industry, including La

Quinta Inn, on best practices for identifying and responding to forced sex trafficking.[5]

46. Widely recognized signs of forced sex trafficking, which can be observed by hotel staff

and which the Harboring Defendant were made of aware of, include but are not limited

---

[1] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking- usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.

[2] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[3] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[4] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[5] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and- Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf.

to:

    a.  Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

    b.  Individuals show signs of physical abuse, restraint, and/or confinement;

    c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e.  Individuals lack freedom of movement or are constantly monitored;

    f.  Individuals avoid eye contact and interaction with others;

    g.  Individuals have no control over or possession of money or ID;

    h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

    i.  Individuals have few or no personal items—such as no luggage or other bags;

    j.  Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

    k.  A group of girls appears to be traveling with an older female or male;

    l.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

    m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

    n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

    o.  Possession or use of multiple cell phones;

    p.  Paying nightly for extended stays with cash; and

    q.  Possession or use of large amounts of cash or pre-paid cards.

47. The Harboring Defendant was aware or should have been aware of these signs of forced

sex trafficking when operating and managing the harboring hotel, when enacting and

enforcing policies and procedures applicable to that hotel, and when training, educating, and supervising the staff of said hotel, and when dealing with Plaintiff and her Trafficker.

48. Given the prevalence of forced sex trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to sex trafficking, it is obvious that the decision of a hotel chain to continue generating revenue from sex traffickers without taking reasonable steps to identify and prevent forced sex trafficking in its hotels is purposely made in its own financial interest by facilitating and participating in the forced sex trafficking.

49. Accordingly, many hotels – upon information and belief, including the hotel and franchisor involved in the present suit – have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels. Particularly for those who are signatories of The Code, as described above.

50. Unfortunately for ▮▮▮ the Harboring Defendant's promises have proven empty. The Harboring Defendant failed to take any action in response to their actual knowledge of forced sex trafficking, including the forced sex trafficking of ▮▮▮ Instead, the Harboring Defendant continued to financially benefit from providing a venue for sexual exploitation of victims, including RED who was repeatedly sexually assaulted, again and again, for 6 years at the La Quinta Inn.

**RED Was Forcibly Sex Trafficked at the Harboring Defendant's Hotel**

51. ▮▮▮ is a survivor of human sex trafficking, and her life story reads like a tragedy.

52. In 2009 ▮▮▮ met "Zaya" through mutual friends while she was still attending high school. ▮▮▮ was fifteen years old.

53. For approximately 6 years, until late 2015, ▮▮▮ was forced to be a sex slave in a sex

trafficking venture between Harboring Defendant and her Trafficker, while being serially harbored at the La Quinta Inn.

54. Not uncommon for teen girls, ███ grew up with a strained relationship with her parents.

55. In 2009, ███ desperately needed money to assist her severely mentally handicapped uncle (who has since committed suicide), and her parents could not afford to help.

56. Zaya sensed ███ was young, naïve and vulnerable and targeted her for trafficking.

57. Zaya promised 15-year-old ███ that he could help her get the money she needed to take care of her uncle and would help her however he could.

58. Zaya earned ███s trust by being kind to her, isolating her from her parents, and showing her photos of expensive vehicles and homes to groom her into thinking he could help her earn an extravagant lifestyle.

59. Zaya pressured ███ into exotic dancing, but she balked at the nature of such a job; then he threatened and beat her, forcing her into a sexual servitude from which she could not leave.

60. Instead of helping ███, Zaya brought her to the La Quinta Inn, took her phone and her other possessions, restrained her, imprisoned her, drugged her, raped her, threatened her, beat her, and announced she would now be working for him and his associates (collectively, "Zaya"). He forced her to work as his sex-slave, forcing her to perform commercial sexual acts with strangers and kept all the money, leaving ███ totally captive, drugged and dependent on him, with no means of escape.

61. During this time Zaya controlled every aspect of ███'s life: he took away most of her possessions, including her money and ID; he restricted her access to food, hygienic necessities, clothing, and sleep; he turned her into an object of commerce by forcing her to wear a sexually explicit "uniform" of his choosing marking her as a sex slave who was

always "on the clock"; he threatened her with extreme violence and death if she refused to comply with the sexual demands of complete strangers or if she attempted to disobey him; he drugged her; he constantly surveilled and physically restrained her; he would not let her speak on a phone without his supervision; he would tightly grip her wrist and forcibly escort her to and from the Harboring Defendant's hotel rooms and, simply put, he forced her to be a subhuman slave he sexually exploited for his own profit with absolutely no regard to her wellbeing or her humanity, as long as she continued to turn a profit for him.

62 ▮ was sexually assaulted thousands of times while at the subject hotels, including by Zaya, and by the Harboring Defendant's owners, managers, employees and/or agents.

63. For 6 years ▮ was merely a sexual object - bought, sold and sexually abused by anyone who paid; this has permanently and catastrophically altered ▮'s life.

64. As can be reasonably expected, the indicia of being forcibly sex-trafficked, every day, *for 6 years*, were omnipresent, open and obvious to the Harboring Defendant.

65. The Harboring Defendant was trained to identify the open and obvious signs that ▮ was being forcibly sex trafficked and had crafted policies to report sex trafficking, as a signatory to The Code, as described above. Incredulously, the Harboring Defendant willingly participated in this venture with ▮'s trafficker, Zaya, so it eschewed its own policies, refused to report what they saw and gladly profited from its own participation in Zaya's sex-trafficking of ▮ RED

66. The omnipresent signs of ▮'s trafficking included:

   a. 16 year-old ▮ was forced to perform commercial sex acts through force, fraud, and coercion, through physical and mental abuse, and by threatening her with harm to herself and her family, and by referencing other individuals Zaya had previously hurt;

**▪ VICTIM'S VOICE, LLC ▪**

b.   Zaya frequently yelled at ▮▮ and physically shoved or jerked her around, often in front of Harboring Defendant including stating he would "beat her skull in";

c.   Zaya either paid or forced ▮▮ to pay for the rooms in her name; Harboring Defendant rented to ▮▮ even though she was clearly under 18 and its policies forbade renting to obvious minors;

d.   ▮▮ and/or Zaya were allowed to consistently pay for rooms with cash or prepaid credit cards over a 6-year period, sometimes refused to provide identification and always paid daily, even during extended stays, even though industry standards and their own policies disapproved of such payments;

e.   ▮▮ checked into and out of the subject hotels with no purse, limited possessions, no luggage, a small backpack at most, no toiletries and no other items that a hotel guest would normally possess when checking into a motel, especially for an extended stay – sometimes for weeks or months at a time;

f.   ▮▮ rarely had her ID (it was kept by Zaya);

g.   The Harboring Defendant's owners, managers, employees and/or agents could see that Plaintiff was extremely young to frequently be seen with random men significantly older than her;

h.   At check-in ▮▮ was frequently bruised, disheveled, dressed in sexually suggestive clothing/ lingerie, and under Zaya's physical grip and control; she did not make eye contact with the Harboring Defendant and was often crying;

i.   RED/ was always dressed in her "uniform" which was sexually explicit and inappropriate for her age, the weather, and the public spaces around the hotel, and had limited access to any other clothing;

j.   Harboring Defendant interacted with and permitted ▮▮ to solicit men for sex near the front desk and in other public spaces around the hotel while they were present, usually while in her "uniform";

k.   Harboring Defendant ignored ▮▮'s visible signs of torment and abuse, including malnourishment, poor hygiene, fatigue, sleep deprivation and signs of drug use, cuts, scrapes, scratches, welts, red marks, bruises, split lips, black eyes, patches of missing hair, cigarette burns, and other such physical signs of physical and psychological abuse;

l.   ▮▮ frequently left blood in her hotel room from beatings by Zaya and the staff never reported same, Harboring Defendant never asked Plaintiff if she was OK and ignored multiple solicitations by ▮▮ for help;

m. Harboring Defendant was within earshot of ███ many times when she was moaning from pain, crying, or asking for help;

n. Housekeeping witnessed "Johns" fleeing from a room after physically assaulting ███ but ignored her solicitations for help as she ran from the room bleeding and with torn and missing clothing;

o. On several occasions ███ ran into the lobby or accosted Harboring Defendant and asked to use the telephone or call the police so she could escape Zaya, but she was always refused assistance;

p. ███ would frequently exit the hotel lobby crying or despondent while with Zaya.

q. The Harboring Defendant's owner, managers, employees and/or agents would hear sounds of abuse, physical violence, screaming, and crying coming from ███'s room, sometimes involving ███ punishment for attempts to escape her captivity or between ███, Zaya and "Johns";

r. ███'s demeanor showed obvious signs of fear and anxiety, she was always visibly nervous, despondent and afraid when interacting with Harboring Defendant;

s. ███ was not allowed to communicate with Defendant's employees without Zaya present, was not allowed to sign in, was not allowed to have a key to her room, and was not allowed to pay for her room without Zaya present;

t. ███ frequently showed signs of disorientation and impairment from being kept in a drugged state by Zaya;

u. RED/ was physically restrained by Zaya (often forcibly jerked by her arm) in front of the Harboring Defendant, frequently when entering or leaving the hotel;

v. Harboring Defendant often made faces or rolled their eyes in disgust at ███ and mocked her as she was escorted on and off the property under physical restraint by Zaya in plain view of them;

w. Harboring Defendant witnessed that ███ was constantly monitored by Zaya when she was in the lobby, public spaces and coming in and out of rooms;

x. A constant stream of men – 15 or more per day – came and went from ███s rooms staying only for a short period, often through the lobby in clear view of Harboring Defendant, without luggage or possessions; surveillance cameras captured the visits. Over the course of 6 years that was thousands of short-term visitors to this obvious minor's room for 20 minutes at a time;

y. Zaya forced ███ to decline housekeeping and rarely allowed Harboring

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

Defendant into the room that they rented on a night-by-night basis;

z.   On the occasions Harboring Defendant observed ███'s room it showed signs of sex trafficking – sex and drug paraphernalia, condom boxes, condoms in the trash cans, messy, unclean from denying housekeeping for long periods;

aa.   ███ and Zaya constantly needed additional towels and sheets at all times of the day or night and could be seen taking out their own trash; sheets consistently soiled with blood and bodily fluids were given to Harboring Defendant;

bb.   During the time period ███ was trafficked at the subject hotels, her trafficker and "Johns" frequently used the on-premises ATM and exhibited no signs that they were hotel guests, such as having any luggage or bags;

cc.   Zaya loitered in the Harboring Defendant's parking lots all day and night while ███ and "Johns," made frequent trips to Zaya's vehicle throughout the night;

dd.   Zaya had suspicious individuals loitering with him while trafficking ██RED who seemed inappropriately aged to be around ██RED██

ee.   Zaya openly paid for assistance from hotel management, ownership and staff;

ff.   The Harboring Defendant received a share of the Zaya's profits as tips, bonuses, sexual favors, bribes, kickbacks, drugs and other remuneration for the use of the hotel, wi-fi, towels, sheets, and for acting as lookouts and informants as part of the sex trafficking enterprise;

gg.   The Harboring Defendant acted as informants and lookouts in the course and scope of their employment and for the benefit of their employer; specifically, they warned Zaya when law enforcement was approaching, or other customers were complaining so he could conceal ███'s trafficking;

hh.   The Harboring Defendant frequently informed Zaya when ███ attempted to leave the hotel property;

ii.   ██RED█ overheard Harboring Defendant directing employees to "double check" for cops, or that police were on the way and to warn Zaya;

jj.   ██RED█ saw Harboring Defendant warn Zaya when there was too much activity coming from the rooms where she was trafficked (or police were coming or complaints came in), and relocated her to a more secluded portion of the hotel – to avoid detection of their trafficking enterprise;

kk.   Police frequently came to the hotel to investigate allegations of prostitution and other crimes, but Harboring Defendant would warn Zaya of the police's

(impending) arrival, and denied Zaya's trafficking of ▮▮ when asked about such activities by authorities;

ll.   Zaya openly operated the sex trafficking enterprise and openly carried weapons at the Harboring Defendant's premises;

mm. The rooms where ▮▮ was forcibly sex trafficked were sometimes located close enough to the lobby that trafficking activities were clearly visible;

nn.   Harboring Defendant allowed Zaya to "back in" to parking spaces so his license plate was difficult to read in an effort to avoid detection and identification by law enforcement even though this was against policy;

oo.   Zaya had prior dealings with the Harboring Defendant involving forced sex trafficking, which were reinstated when he started trafficking RED;

pp.   For years Zaya had a sex trafficked enterprise with the Harboring Defendant at the subject hotel prior to ▮▮

qq.   Based on actions and communications between Zaya and Harboring Defendant, Zaya was a repeat customer, even at the initial check in;

rr.   Zaya chose to traffic RED at the subject hotels because of prior dealings with the Harboring Defendant and knew he could operate the sex trafficking enterprise "safely" at these hotels;

ss.   ▮▮ heard Zaya state that he knew personnel at the subject hotels and there would be no trouble there;

tt.   Harboring Defendant continuously renewed its business relationship with Zaya over a six-year period by re-renting rooms to him despite its actual and constructive knowledge that ▮▮ was being trafficked by Zaya;

uu. RED overheard the Harboring Defendant say things to Zaya along the lines that prostitution was bringing in a lot of money.

vv.   By renting a room to R▮'s trafficker, Defendant was knowingly associating with him in forcing RED to serve their business objectives.

ww. There was a booming sex trafficking industry at the subject hotel before and during the time that ▮▮ was trafficked at said hotel;

xx.   The Harboring Defendant showed indifference to ▮▮'s obvious physically troubled condition;

yy. The subject hotel was in an area known to be used for drugs, trafficking, and prostitution;

zz. Zaya conducted multiple illegal drug sales throughout the day at the subject hotels in adjoining rooms or in the parking lot;

aaa. Harboring Defendant failed and refused to hire security personnel to curb the sex trafficking at the subject hotels;

bbb. Harboring Defendant failed to post legally mandated anti-trafficking signs and notices at the subject hotels;

ccc. Harboring Defendant controlled the training, policies, protocols, rules, and guidelines at the subject hotel. Given the availability of training materials from the American Hotel Lodging Association, ECPAT-USA, and other resources, the Harboring Defendant knew or should have known of the "critical role" that the hotel industry plays in "enabling" the sex trade, and of the "widespread national epidemic of hotel/motel sex trafficking." Despite that, the Harboring Defendant failed to adequately implement education, training, and policies to prevent sex trafficking at their hotel. Because of the Harboring Defendant's failures, R.R. was repeatedly victimized and trafficked for sex on the subject hotel's premises; and

ddd. Harboring Defendant "knowingly benefited" from ▮▮▮ being sex trafficked because it received payment for the rooms rented to individuals it knew or should have known were engaged in sex trafficking. It also financially benefitted from payments received for Zaya's use of hotel Wi-Fi, which enabled the subject sex trafficking to occur, as Zaya advertised RED on multiple trafficking websites, none of which were blocked.

67. Not only was REDs forced sex trafficking open and obvious, but the Harboring Defendant and its employees were uniquely positioned to observe its signs, should have observed its signs and they did observe its signs. Additionally, Harboring Defendant constantly monitored guest activity on the premises and was well-trained to identify and report any sex trafficking, which they willingly chose not to do.

68. In fact, the Harboring Defendant's employees had conversations with ▮▮▮, observed her entering and leaving the premises, observed her in the lobby area, and directly interacted with her. They frequently reacted to ▮▮▮ s presence in the hotel either with social cues

of disgust, such as eye rolling, frowning, head shaking, or making derogatory statements under their breath, or with knowing and salacious statements, leering, or salacious comments regarding sex or Plaintiff's availability for sex, and/or bartered, paid for or were rewarded with forced sex directly with her as payment for look-out services, room rentals, or as a share of profits.

69. The open and apparent nature of ▉'s forced sex trafficking activity is confirmed by the fact that multiple guests made complaints and wrote bad reviews about sex trafficking activities. For example, multiple guests indicated they had made complaints to ▉ in passing and in publicly available reviews include the following excerpts against the Harboring Defendant:

a. "brothel and I am shock to see that it is apart of a big corporation like Wyndham and is not representing the brand well."

b. "The management was letting drug dealers sell drugs openly!"

c. "... the neighborhood is a little rough. Hookers are using it as a base of operations, and the old-style outdoor hallway layout puts all this action right outside your front door."

d. "I reported this to the manager and asked that repairs be made. This was the first time I've every shortened my stay with LaQuinta and I feel like I should be reimbursed for feeling threatened by the men that looked like pimps, repo truck taking a car of a family who apparently has been living there."

e. "However, the clientele was very scary. There were prostitutes and other nasty looking people staying at the hotel... It was very obvious. I would have rated the hotel higher if it wasn't for the clientele."

▪ **VICTIM'S VOICE, LLC** ▪

f.   "Upon arriving we didn't feel safe, working girls walking the halls and people in groups hanging and doing what looked to be drug deals!"

g.   "Prostitution, black mold, urine. All for the low price of $200/night! Prostitute at the front door soliciting, black mold on the ceiling, urine on the tub and toilet, smelled like old socks inside the room and feces/marijuana outside the room, someone has their room desk outside their room in the hallway. Incredibly unsafe and absolutely disgusting."

h.   "Overall poor experience due to smell inside the room and loitering of drug users and prostitutes in the hallways."

70. While actively participating in this sex-trafficking venture with her traffickers Harboring Defendant was acting in the course and scope of their employment specifically and explicitly for the benefit of their employers and of the hotel.[6]

71. The actions and knowledge of the Harboring Defendant, taken within the course of their employment for Defendant's benefit, are imputed to the Harboring Defendant. *Doe v. Hotels*, 2024 WL 2955728, at *5.

72. Additionally, ▮▮▮ witnessed clear signs of forced sex trafficking of other victims that the Harboring Defendant knew or should have been aware of:

a.   ▮▮▮ saw other sex traffickers and their victims openly operating and being forcibly escorted to and from the rooms by other traffickers at the subject hotels during the time that she was being trafficked at Harboring Defendant's property;

b.   ▮▮▮ saw at many other sex traffickers and their victims openly operating at the subject hotels during the time that she was being trafficked at Defendant's property;

---

1. [6] The TVPRA permits agency liability. *Doe v. Hotels*, 2024 WL 2955728, at *5 (M.D. Fla. 2024) (citing *Treminio v. Crowley Maritime Corporation*, 649 F.Supp.3d 1223, 1232 (M. D. Fla. 2023), 649 F. Supp. 3d at 1232 (collecting cases and declining to dismiss TVPRA claim against corporation for violative acts of its employees)). An employer can be held liable for the tortious or criminal act of an employee if the act was committed during the course of employment to further a purpose or interest of the employer. *Id.* (citing *Doe v. St. John's Episcopal Par. Day Sch., Inc.*, 997 F. Supp. 2d 1279, 1287–88 (M.D. Fla. 2014)).

c. ███ believes she was just one of many other sex trafficking victims similarly trafficked at the subject hotels during the same time;

d. ███ met other sex trafficking victims at the subject hotel, some who appeared to be minors during the time that she was trafficked there;

e. ███ witnessed other victims in their sexually explicit "uniforms" loitering around the subject hotels in plain view of the Harboring Defendant with visible signs of coercion (cuts, abrasions, bruises, bandages, etc.);

f. ███ witnessed other victims in plain view of the Harboring Defendant strung out on drugs;

g. ███ witnessed other victims in plain view of the Harboring Defendant looked exhausted and haggard due to forced sex work at all hours of the day for many days at a time;

h. ███ witnessed other victims in plain view of the Harboring Defendant in their "uniforms" inappropriately for the location and weather;

i. ███ witnessed other victims making repeated trips to the parking lot to deposit cash with traffickers, in plain view of the Harboring Defendant, often the traffickers had much nicer vehicles than you would expect at a budget hotel;

j. ███ witness other victims with obvious "Johns" traveling in and out of the hotel rooms in plain view of the Harboring Defendant's owner, managers, employees;

k. RED witnessed other victims and their traffickers propping open doors, and she noticed doors propped open after hours so "Johns" might have easier access.

73. The Harboring Defendant certainly knew or should have known that ███ was being forcibly sex trafficked on their property. In fact, they wittingly participated in this venture by harboring REC for sex trafficking, ignoring the obvious signs and purposely eschewing their own policies to increase their profits.

### ███ was Harbored as Part of Sex Trafficking Enterprise

74. Zaya and the Harboring Defendant participated in a sex trafficking enterprise that worked like this:

**▪ VICTIM'S VOICE, LLC ▪**

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

21

a. Zaya booked a room at Harboring Defendant's hotel requesting a specific type of room–either in the trafficking wing, secluded from the rest of the guests, or with sight lines to the road so law enforcement can be easily spotted (a clear sign of sex trafficking and a dog whistle for the Harboring Defendant that Zaya had a prior relationship there) (this would be done upon check-in if the first night was rented online or through a corporate website);

b. Zaya posted internet ads for ███s commercial, sexual availability using hotel Wi-Fi from his "burner" phone, typically from the parking lot. "Johns" would call, █████ price was negotiated, and the "John" was sent to the room;

c. The "John" was either met in the lobby and escorted to the room; the "John" would request █████ room number from hotel staff; or the "John" would otherwise be directed to ██ room (10-15 "Johns" per night, 20-minute stays to the same room is a clear sign of trafficking);

d. The "John" paid █████ for the commercial sex act in the room, the act was consummated, and the "John" would leave. RED then exited the room, ran to the parking lot and deposited the cash with Zara was loitering in his car in the lot (clear signs of trafficking);

e. While █████ performed sex acts with the "John," Traffickers loitered in the parking lot of the hotel, often in a luxury vehicle with aftermarket modifications, which doubled as his office, where he ran the trafficking enterprise (clear signs of trafficking);

f. During the busiest hours of the evening, hotel staff looked out for law enforcement, and disturbances or complaints by other guests, warning Zaya or RED of same so the enterprise would not be disrupted (awareness of trafficking);

g. Sometimes, based on tips or suggestions from Harboring Defendant, █████s room would be relocated (clear sign of trafficking);

h. In the morning, Zaya used cash from the previous night's trafficking as payment to rent the room(s) for just one additional night so ██. could again be sex trafficking on an ongoing basis, and sometimes tips would be presented to Harboring Defendant at this time; this process would be repeated over and over even during long-term stays at the harboring hotel (clear signs of trafficking);

i. █████ Traffickers also engaged in the commercial sale of illegal drugs on premises with sales taking place either in the hotel room or in public areas of the hotel often to hotel staff;

j. Zaya routinely stayed at the subject hotels for consecutive weeks but always only paid for one night at a time (a clear sign of sex trafficking);

k.    ███ and Zaya would have little to no luggage or personal possessions for extended stays and she always wore her "uniform" (a clear sign of sex trafficking);

l.    ███was confined her room for long periods of time, but would occasionally loiter on property soliciting Johns when the occasion arose and she rarely was seen leaving the premises, and without Zaya or another, often significantly older handler at least closely observing her (a clear sign of sex trafficking);

m.    ███ and Zara's rooms consistently displayed "Do Not Disturb" signs on the doors to the room where the Plaintiff was engaged in commercial sex acts often for weeks at a time (a clear sign of sex trafficking);

n.    "Johns" frequently entered and left ███'s room at all times of day and night – typically 10 to 15 times a night (a clear sign of sex trafficking) and they never had luggage, bags or any indication they were guests;

o.    After a few weeks of safe harbor and cooperation from the Harboring Defendant, Traffickers would take ███ to a new property temporarily, only to return shortly for another extended stay in the safe confines of the present hotel.

p.    16-year-old ███ was forced to be a sex slave for 6 years of her life when she should have been with her family, out making friends and living the life of a teen and young adult; possibly even getting married and having her own family; these are years she will never get back.

q.    The Harboring Defendant aided, abetted, facilitated and encouraged the above activities by warning RED's trafficker regarding police activity, by relocating ███. to a secluded portion of the Motel to avoid detection by other guests and police, by ignoring Plaintiff's requests for help, by failing to report that ███ was being forcibly trafficked for sex, and by accepting payment in cash and without identification to conceal Traffickers' illegal activities.

75. For approximately six years ███ was a sex slave in this enterprise, the routine being repeated with thousands of "Johns," many complaints, contacts between the Harboring Defendant, RED, and her Traffickers, and yet Harboring Defendant, with all their training, surveillance, observation and expertise chose to participate in the venture for profit rather than intervene on behalf of ███

76. Despite many, many indicia of forced sex trafficking taking place every day, openly and obviously, in front of Harboring Defendant, never did it attempt to

identify or report the sex trafficking of ▮▮▮▮ (or anyone else).

77. Local police were cognizant of the foregoing routine and conduct from afar, making it impossible for the Harboring Defendant to be ignorant of what was occurring right in front of them.

78. ▮▮▮▮ Traffickers operated with little regard for concealment due to an understanding that the Harboring Defendant would look out for the best interest of their joint sex trafficking venture and warn him of police activity, enabling her Traffickers to operate openly, as he had found a venue where they could conduct their operations without disruption.

79. Sex crimes and human trafficking were reasonably foreseeable to the Harboring Defendant and occurring on their premises, specifically against ▮▮▮▮

80. Additionally, the Harboring Defendant, individually and/or by their actual or apparent agents, servants, franchisees and/or employees, knew or had constructive knowledge that the sale and usage of illegal drugs were being performed on the premises.

81. Thankfully, through much difficulty ▮REDA▮ was eventually able to escape the grasp of her Traffickers and the prison the hotel served as. She escaped her captor/trafficker without any aid or assistance from the Harboring Defendant.

82. ▮REDA▮ has spent a considerable amount of time attempting to regain the life that was stolen from her by being a forced sex slave.

83. ▮REDA▮ brings this lawsuit expressly to hold the Harboring Defendant accountable for knowingly benefiting from her sexual trafficking.

▪ **VICTIM'S VOICE, LLC** ▪

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

## VIOLATIONS OF THE TVPRA

84. Section 1591(a) of the TVPRA criminalizes the actions of anyone who knowingly:

    (1)   recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

    (2)   benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or...in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act[.]

85. Section 1595 of the TVPRA creates two kinds of civil liability: perpetrator liability and participant liability. Since it was first enacted, the statute has allowed the victim to sue "the perpetrator." 18 U.S.C. § 1595(a).

86. The TVPRA provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator[.]" 18 U.S.C. § 1595(a). A perpetrator under § 1595(a) is "someone who has violated the criminal statute." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021). To establish her claim, Plaintiff must therefore allege sufficient facts that KISHANVB violated 18 U.S.C. § 1591(a); *Doe #1 v. Crowley Mar. Corp.*, 2024 WL 1346947, at *7 (M.D. Fla. Mar. 29, 2024).

### COUNT I – CPLG WEST PALM BEACH L.L.C. VIOLATED THE TVPRA AS A PERPETRATOR

87. Plaintiff, ███, hereby adopts and re-alleges each and every allegation in paragraphs one through eighty-six above and further states:

88. ███ is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under 18 U.S.C §1595 against any the "perpetrator" of any violation of the TVPRA.

89. Defendant, CPLG WEST PALM BEACH L.L.C., is a perpetrator within the meaning of

18 U.S.C §1595 because they violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored ███ by renting a room to ███.'s trafficker and providing him and ███ with hospitality services despite knowing or in reckless disregard of the fact that ███ would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the La Quinta Inn.

90. To "harbor" is "to give shelter or refuge to." *Doe v. Hotels,* 2024 WL 2955728 (M.D. Fla. 2024) (citing Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harbor; Safe Harbor, Black's Law Dictionary (11th ed. 2019) ("An area or means of protection")); cf. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 723–25 (analyzing plain meaning of TVPRA provisions by using dictionaries to define terms).

91. Providing lodging to someone for the purposes of obtaining his or her labor or services against his or her will constitutes "harboring" under the TVPRA. *Doe v. Hotels,* 2024 WL 2955728 at (quoting *Mouloki v. Epee*, 262 F. Supp. 3d 684, 698 (N.D. Ill. 2017)); see *United States v. Gatlin*, 90 F.4th 1050, 1060 (11th Cir. 2024) (showing that a defendant "harbors" an individual under section 1591(a) when the defendant allows the individual to stay at the defendant's house (citing *United States v. Mozie*, 752 F.3d 1271, 1286 (11th Cir. 2014)); *Jane Doe K.R. v. Choice Hotels*, 2024 WL 4373374, at *8 (M.D. Fla. 2024) (same).

92. Defendant knowingly harbored Plaintiff with actual knowledge or reckless disregard of the fact that force, threats of force, or coercion would be used to force Plaintiff to engage in commercial sex acts. Defendant is therefore liable for "harboring" Plaintiff under the TVPRA. *Doe v. Hotels,* 2024 WL 2955728 at *8.

93. Defendant had both actual knowledge of ███'s forced sex trafficking and actually participated in her sex trafficking.

**▪ VICTIM'S VOICE, LLC ▪**

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

94. The facts above show that Defendant entered into either an overt or tacit agreement with Plaintiff's traffickers to provide them with rooms, shelter and participation in the trafficking enterprise whereby Plaintiff would be forcibly trafficked for profit.

95. Defendant is a perpetrator within the meaning of 18 U.S.C §1595 because it violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, Defendant knowingly received financial benefit by actively participating in a venture that it knew, or was reckless in not knowing, engaged in unlawful sex trafficking. Specifically, Defendant had an informal, implicit arrangement with sex traffickers, including ▆'s sex traffickers, whereby Defendant received revenue by renting hotel rooms to these traffickers on an ongoing basis despite knowing, or in reckless disregard of the fact, that these rooms would be used as a venue for the forced sexual exploitation of individuals, including ▆.

96. Further, Defendant through its owners, managers, employees and/or agents, actively assisted, aided and abetted ▆'s Traffickers, and participated in operating his sex-trafficking enterprise by operating as police "lookouts," by relocating ▆ and her Traffickers to rooms at the La Quinta Inn conducive to forced sex trafficking after other guests complained, by purchasing or bartering for sex with ▆ directly, by aggressively ignoring ▆'s signs of forced sex-trafficking, and by the other means set forth in the above paragraphs.

97. Further, Defendant had a prior relationship with Zaya in which they were involved in sex trafficking previously, including forced sex trafficking, showing that they knew that Zaya brought her to the harboring hotel for the purposes of sex trafficking.

98. Defendant's violations of 18 U.S.C §1591(a) operated jointly with the other unlawful acts and omissions of Defendant outlined in this Complaint, to cause ▇▇▇ to suffer substantial physical and psychological injuries and other harm as a result of being trafficked and sexually exploited.

99. As a direct and proximate result of the above egregious acts of Defendant, ▇▇▇ has been permanently injured and damaged physically, emotionally, psychologically, and financially.

WHEREFORE, Plaintiff ▇▇▇ demands judgment for damages against the Defendant, CPLG WEST PALM BEACH L.L.C., in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorneys' fees if allowable by law, and such other and further relief as the Court deems just and proper, both in law and in equity. Plaintiff further demands trial by jury as to all issues triable as a matter of right to a jury.

## COUNT II – CPLG WEST PALM BEACH L.L.C. BENEFITTED FROM THE FORCED SEX TRAFFICKING OF R.R.

100. Plaintiff, ▇▇▇ hereby adopts and re-alleges each and every allegation in paragraphs one through eighty-six above and further states:

101. Plaintiff was a victim of sex trafficking within the meaning of 18 U.S.C. § 1591 and Defendant, CPLG WEST PALM BEACH L.L.C., was a "beneficiary" of that sex trafficking within the meaning of 18 U.S.C. § 1595(a)(2).

102. Defendant knowingly received a financial benefit from participating in a venture with Plaintiff's Traffickers, even though it knew or should have known that her Traffickers were engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendant is liable to ▇▇▇ as a sex trafficking beneficiary under the TVPRA.

103. Beneficiary liability under the TVPRA arises when a defendant "participat[es] in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]." 18 U.S.C. § 1595(a)(2).

104. To establish a TVPRA beneficiary claim pursuant to § 1595(a), the plaintiff must show that the defendants (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA, and (4) that the defendants had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 719.

**Defendant Knowingly Benefitted from Zaya's Sex Trafficking Enterprise.**

105. The first element of a TVPRA beneficiary claim requires a plaintiff to allege that Defendants "knew it was receiving some value from participating in the alleged venture." *Doe #1 v. Red Roof Inns*, 21 F.4th at 724. For this element, the Court is concerned not with whether Defendants participated in a venture, but only with whether Defendants knowingly benefited from the trafficking enterprise – either "financially or by receiving anything of value." *Id.*

106. In the context of a hotel operator, a plaintiff may establish that a defendant knowingly benefited under the TVPRA by "repeatedly renting rooms that defendant knew or should have known were being used for sex trafficking." *Doe v. Hotels*, 2024 WL 2955728, at *7 (citing *A.D. v. Holistic Health Healing Inc.*, 2023 WL 3004546, at *3 (M.D. Fla. Apr. 19, 2023)).

107. A hotel's receipt of revenue from room rentals is a financial benefit from a relationship with a trafficker sufficient to satisfy the first element of the TVPRA standard. See *Does*

*1-4 v. Red Roof Inns, Inc.*, 688 F.Supp.3d 1247, 1253-54 (N.D. Ga. Aug. 10, 2023) (receipt of room rental revenue constituted a "benefit" under § 1595(a)).

108. It has been set forth above in detail that Defendant knowingly received such revenue from Plaintiff's trafficker and knew or should have known that ███ was being sex trafficked. Plaintiff's Traffickers paid Defendant for the hotel rooms in which Plaintiff was trafficked to men for sex. Traffickers selected the La Quinta Inn as the location where Plaintiff was trafficked and either paid directly for the hotel rooms or forced Plaintiff to pay for the rooms in her name. Traffickers were repeat customers at the hotel and had a prior relationship with Defendant, as discussed above.

109. Further, Defendant received more than simply room rentals as a benefit of Traffickers' sex trafficking enterprise. In addition, Defendant received other financial benefits in the form of food sales, beverage sales, parking fees, condom sales, ATM fees, wi-fi fees, and portions of Plaintiff's traffickers' profits in the form of tips, bribes, sexual favors, and payments, from those persons who were engaging in sex trafficking. Defendant received consistent cashflow from Plaintiff's Traffickers and other traffickers from renting multiple rooms over multiple nights over several months and years.

110. Harboring Defendant knowingly benefited from Plaintiff's trafficking through monies coming in through fees from room rentals, Wi-Fi, parking, on-premises vending, tips, kickbacks, portions of Traffickers' profits, ATM fees, etc., and other benefits such as assurances of consistent occupancy, information gleaned from hotel loyalty programs, attractiveness to other trafficking enterprises, avoiding excessive police attention, etc.

111. There are ample facts described above establishing that Defendant knowingly received revenue from ███'s Traffickers with actual or constructive knowledge that she was

forcibly sex trafficked.

**Defendant Knowingly Benefitted from Participating in a Venture**

112. To establish the second element of a TVPRA beneficiary claim, a plaintiff must plead facts to establish that the Defendants knowingly benefitted "from participating in a venture." see *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 724.

113. "Venture" is defined as an "undertaking or enterprise involving risk and potential profit," and participation as "to take part in or share with others in common or in an association." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 724–25. Thus, to plead this element, Plaintiff must allege that Defendants took part in a common undertaking or enterprise with Plaintiff's Traffickers involving risk and potential profit. *Id.*

114. Allegations that a plaintiff's abuser had prior commercial dealings with the operator, which the parties wished to reinstate for profit, establish a hotel operator's participation in a venture with a sex trafficker. *Doe #1 v. Red Roof Inns, Inc.*, 21 F. 4th at 725–26 (citing *Ricchio v. McLean*, 853 F.3d 553, 556–58 (1st Cir. 2017)).

115. Defendant, CPLG WEST PALM BEACH L.L.C., took part in a common venture involving risk or profit with ▮ Trafficker as described in greater detail above, including:

   a. Harboring Defendant provided lodging to Plaintiff's Traffickers for a common goal of the forced sex trafficking and to profit from the forced sex trafficking of ▮;

   b. Harboring Defendant, directly rented rooms to people it knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

   c. Harboring Defendant, had continuing commercial dealings with Plaintiff's Traffickers, including a course of business that involved accepting cash payments for room reservations, looking out for law enforcement on behalf of Plaintiff's Traffickers while ▮ was being forcibly trafficked, moving Plaintiff's Traffickers and ▮ away from the prying eyes of law enforcement when necessary and

providing isolated rooms away from normal foot traffic of hotel guests, but which were easily accessed by sex-trafficking customers by back or side doors, which Defendant, its owner, managers, employees and/or agents would leave unlocked and unmonitored;

d. Harboring Defendant had a continuous business relationship with Plaintiff's Traffickers such that Defendant established a pattern of conduct with said Traffickers;

e. Harboring Defendant associated with Plaintiff's traffickers by facilitating their trafficking enterprise as set forth above, and by facilitating REDs captivity as set forth above;

f. Harboring Defendant ensured that Plaintiff's Traffickers' room rentals were limited to certain areas of the property that were isolated and sequestered, such that the Defendant were aiding in hiding the trafficking from police and others who might report it to the police and was thereby furthering the venture;

g. Harboring Defendant provided discounts and free rooms in exchange for sexually assaulting Plaintiff;

h. Harboring Defendant, shared in Plaintiff's Trafficker's profits, and were given tips and bonuses for being helpful to the Traffickers, sometimes after busy nights or providing information, portions of which were shared directly with Defendant;

i. Harboring Defendant, its owner, managers, employees and/or agents acted as lookouts and informants as part of their scope of duty for the benefit of their employers;

j. Harboring Defendant, purposely crafted a safe environment for the sex trafficking venture by ignoring massive amounts of nightly short-term traffic to ████s room, RED's repeated trips to deposit money to Plaintiff's Traffickers in the parking lot, her pleas to help her escape (including running naked through the lobby and soliciting assistance) and bent its own rental policy by accepting cash for nightly rentals without ID (from an obvious minor).

k. Harboring Defendant observed Traffickers engaging in actions that clearly indicated they were trafficking ████ (treating her poorly, lacking freedom of mobility, depositing money to Traffickers in the parking lot, paying daily in cash for rooms during extended stays, etc.), and acted to protected the Traffickers and the trafficking enterprise (ignored ████'s inappropriate dress, ignored her pleas for help, refused to investigate disturbances or report trafficking to police – even when police inquired, etc.).

116. Defendant had a continuous business relationship with Plaintiff's Traffickers due to their prior sex-trafficking history, which her Traffickers indicated was the reason they returned to the harboring hotel to forcibly sex-traffic ███ knowing that Defendant, its owners, managers, employees and agents cooperated with and participated in the sex trafficking venture.

117. Harboring Defendant's owner/manager welcomed Plaintiff's Traffickers when they returned to the hotel to begin their sex trafficking enterprise with REDA making it clear they had prior relations.

118. ███ had been beaten and raped, and was bruised, cut, marked, emaciated, exhausted, and showed obvious signs of forced sex trafficking when she was first brought to the hotel and first met Harboring Defendant's owner/managers, who ignored her condition when he welcomed Plaintiff's Traffickers back to the harboring hotel; these indicia were visible by Defendant's employees and agents throughout on her confinement at the hotel.

119. Plaintiff's Traffickers had prior commercial dealings with Harboring Defendant in which they sexually trafficked other victims at the hotel in violation of the TVPRA. Plaintiff's Traffickers and Defendant reinstated their prior relationship for profit, and Defendant was aware that REDA was being used as a sex slave. A hotel operator participates in a venture with a sex trafficker when the trafficker "had prior commercial dealings" with the operator, "which the parties wished to reinstate for profit." *Ricchio*, 853 F.3d at 555; *Doe #1 v. Red Roof Inns*, 21 F.4th at 725.

120. Harboring Defendant did much more than just rent rooms to sex traffickers and observe signs of trafficking. As stated above, there was a booming sex trafficking business at Defendant's hotel. Other traffickers sold girls for sex at the hotel in the timeframe relevant

to ■■■■ s being forcibly sex trafficked at the hotel. Plaintiff alone was trafficked to thousands of men during the time that she was captive on the property.

121. Harboring Defendant's owner/managers openly discussed the details of ■■■■ s forced sex trafficking in front of her. Zaya never hid the fact that ■■■■ was being forcibly sex-trafficked from Harboring Defendant's owners, managers, employees or agents, openly abusing her and controlling her in public, forcing her to openly solicit customers on the property, forcibly escorting her to and from the lobby of the hotel in front of Defendant's owners, managers, employees and agents, and openly displaying her with bruises, marks, cuts, and other signs of her confinement and abuse.

122. Moreover, the evidence directly links specific conduct by Harboring Defendant's owners, managers, employees and agents to the advancement of Plaintiff's Traffickers' sex trafficking enterprise. Harboring Defendant assisted her Traffickers by acting as lookouts for them, and by informing them of police activity at the harboring hotel, as well as warning them about guest complaints and high visitor traffic drawing unwanted attention to the sex trafficking enterprise.

123. Further, Harboring Defendant's managerial staff directed its employees to relocate Plaintiff in response to complaints and police to assist her Traffickers in concealing the joint trafficking enterprise.

124. Harboring Defendant's owners, managers, employees and agents permitted ■■■■ and other victims, who were consistently scantily clad, to solicit sex on premises including in and around the lobby and desk area of the hotel.

125. Harboring Defendant's owners, managers, employees and agents maintained an ongoing relationship with Plaintiff's Traffickers.

126. Harboring Defendant's owners, managers, employees and agents failed to act when they saw ████ openly beaten, abused, injured, and confined while they were present. Defendant's owners, managers, employees and agents nonchalantly ignored the ████ pleas for help and her visibly battered and bruised condition. They saw Plaintiff's Traffickers physically force ████ back to her room when she tried to escape.

127. Harboring Defendant participated in the profit of a joint sex trafficking enterprise by keeping its rooms rented rather than sitting vacant, by accepting tips, bribes and bonuses from Plaintiff's Traffickers, and by attracting other sex traffickers who became aware that the harboring hotel was a "haven" for sex trafficking where they could operate without the threat of management interference and with safeguards against police interference. There was "profit" for Defendant and Plaintiff's Traffickers alike. Defendant received consistent cashflow and security from Plaintiff's Traffickers renting multiple rooms for multiple nights over 6 years. And Plaintiff's Traffickers profited from operating in an environment that was hospitable to trafficking – one in which hotel employees would, among other things, not call the police, permit trafficking victims to solicit men in hotel common areas, visit traffickers' rooms to inquire if trafficking victims needed anything, and have sex with trafficking victims.

128. There was also a shared risk for Defendant and Plaintiff's Traffickers, in that police frequently came to the hotel, sometimes to investigate prostitution. Moreover, Defendant took the risk of loss of business due to bad reviews, guest complaints, and damage to the hotel itself from ongoing criminal activity.

129. Defendant participated in a venture where the acts and omissions of its owner, managers, employees and agents served to support, facilitate, harbor, and otherwise further the

Traffickers' sale and victimization of Plaintiff for commercial sexual exploitation by repeatedly renting rooms to Plaintiff's Traffickers who they knew or should have known was engaged in the forced sex trafficking of ███

130. The above allegations establish that Harboring Defendant participated in a venture with ███'s trafficker under the second element of TVPRA beneficiary liability. See *I.R. v. I Shri Khodiyar, LLC*, 723 F.Supp.3d 1327, 1337-38 (N.D. Ga. 2024); *K.H. v. Riti, Inc.*, 2024 WL 505063, at *3 (11th Cir. 2024); *S.Y. v. Marriott Int'l, Inc.*, 2021 WL 2003103, at *4 (M.D. Fla. 2021).

**Venture Violated TVPRA as to Plaintiff**

131. To establish the third element of a beneficiary claim, "the venture in which the defendant participated and from which it knowingly benefited must have violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725.

132. The venture between Plaintiff's Traffickers and Harboring Defendant engaged in violations of 18 U.S.C. § 1591(a). Section 1591(a) "makes it a crime to 'knowingly' harbor or solicit a person for commercial sex while 'knowing...that means of force, threats of force, fraud, coercion..., or any combination of such means will be used to cause the person to engage in a commercial sex act'" and also "prohibits anyone from knowingly 'benefit[ing], financially or by receiving anything of value' from 'knowingly assisting, supporting, or facilitating a violation of subjection (a)(1)." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725 (citing 18 U.S.C. § 1591(a)).

133. Plaintiff was a victim of human trafficking at the harboring hotel and that her trafficking was the result of an "implicit agreement" between her Traffickers and the harboring hotel owner, managers, employees and agents to facilitate her trafficking through, among other

things, the rental of hotel rooms, acting as lookouts and informers for police activity, actively relocating ███ to a more concealed area of the hotel to help Plaintiff's Traffickers escape detection of his sex-trafficking activities to guests and law enforcement, and by ignoring Plaintiff's cries for help – these are all actions done by the Harboring Defendant specifically on account of and in awareness of ████.

134. The venture between Plaintiff's trafficker(s) and Harboring Defendant violated the TVPRA with respect to Plaintiff because:

   a. Plaintiff's Traffickers recruited the Plaintiff to participate in commercial sex acts at the Defendant's hotel by, among other reasons, stating that he would take care of the Plaintiff and then using force, coercion, threats and physical violence to force Plaintiff to work as a sex slave;

   b. Plaintiff's Traffickers and Defendant harbored the Plaintiff at Defendant's hotel for the purpose of forcing Plaintiff to engage in commercial sex acts at the property;

   c. Plaintiff's Traffickers transported the Plaintiff to the Defendant's hotel for the purpose of Plaintiff participating in commercial sex acts at the hotel;

   d. Plaintiff's Traffickers maintained Plaintiff at the Defendant's hotel for the purpose of Plaintiff participating in commercial sex acts at the hotel;

   e. The commercial sex acts occurred at the Defendant's hotel in rooms rented by Plaintiff's Traffickers;

   f. Plaintiff's Traffickers used force, threats of force, fraud, and coercion to cause Plaintiff to continue to participate in commercial sex acts at the Defendant's hotel including beating the Plaintiff;

   g. Plaintiff's Traffickers threatened the Plaintiff with violence against her and her family and used this tactic to cause Plaintiff to engage in commercial sex acts at the Defendant's hotel;

   h. Plaintiff's Traffickers de-frauded Plaintiff by falsely telling Plaintiff that they would take care of Plaintiff, and then forcing Plaintiff to work as a sex slave the Defendant's hotel;

   i. Plaintiff's Traffickers knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited the Plaintiff to engage in commercial sex acts

in the Defendant's hotel that Plaintiff's Traffickers rented from Harboring Defendant;

j.  Buyers came to the hotel to purchase and purchased the "right" to have sex with Plaintiff from Plaintiff's Traffickers, and then the buyers raped her at the Defendant's hotel;

k.  Plaintiff's Traffickers utilized the hotel's wireless internet connection to post advertisements of Plaintiff for the commercial sex acts;

l.  Defendant was aware or should have been aware that ▮▮▮ was being forcibly trafficked for sex by Plaintiff's Traffickers at the Defendant's hotel but nevertheless continued to rent rooms to Plaintiff's Traffickers for said purpose;

m.  Other actions to be proven at trial.

135. The third element of beneficiary liability under the TVPRA is sufficiently pled where the complaint alleges that the plaintiff was sex trafficked in violation of § 1591(a). See *A.D. v. Best W. Int'l, Inc.*, 2023 WL 2955832, at *8 (M.D. Fla. Apr. 14, 2023). Plaintiff ▮▮▮ has pled those allegations and satisfied the third element of beneficiary liability under the TVPRA.

**Knowledge that Venture Violated the TVPRA as to the Plaintiff.**

136. To sufficiently plead the fourth element, "the defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited—violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725. § 1595(a)(2) imposes liability where a defendant "knew or should have known [that the venture] has engaged in an act in violation of this chapter." Id.; see also *Doe #1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136, 1155 (N.D. Ala. 2022); *Doe v. Hotels*, 2024 WL 2955728, at *5.

137. In this case, Harboring Defendant's owners, manager, employees and agents actively took steps to facilitate Plaintiff's Traffickers' use of the hotel for the forced sex trafficking of

████ and worked together with Plaintiff's Traffickers to force her to serve their business objectives of keeping the hotel as fully booked as possible. For example, Harboring Defendant's owner, manager, employees and agents acted as police lookouts; relocated Plaintiff's Traffickers and ████ to quieter rooms to assist Plaintiff's Traffickers with escaping detection by police or other guests; tailored housekeeping services to provide as little disruption to Plaintiff's Traffickers' sex trafficking of ████ as possible; permitted ████ and other girls, all wearing lingerie, to solicit men for commercial sex in the front desk area of the hotel while employees were present and interacted with ████ and the other girls; solicited ████ for sex directly; bartered for forced commercial sex with ██ in exchange for a free room; nonchalantly ignored Plaintiff's marks, cuts, bruises, burns, and injuries; nonchalantly ignored Plaintiff's pleas for help when she tried to escape or requested help to escape; saw Plaintiff grabbed, kicked and forcibly detained by Plaintiff's Traffickers' during her escape attempts and ignored her plight; accepted payoffs from Plaintiff's Traffickers' in the form of drugs, money and sex for acting as lookouts; etc.

138. Further, Plaintiff showed obvious signs of illegal and forced sex trafficking, including being injured, beaten, emaciated, and was obviously drugged. Moreover, other girls were at the hotel at the same time, and before her presence at hotel, and were either underage or likewise showed signs of physical abuse similar to those of ████.

139. The Harboring Defendant knew Plaintiff was being trafficked for sex as Plaintiff would walk around in her "uniform" and solicit customers on premises including in the lobby and near the front desk. The hotel rooms in which Plaintiff was trafficked, including the sheets, carpet and walls, would sometimes be soiled with blood when she and her Traffickers left. A steady flow of adult men — sometimes 15 in one night — would go in

and out of Plaintiff's hotel rooms each night she was there. One of those rooms was located close to the lobby where all of this could be seen and frequently heard. ▉ and her Traffickers paid in cash daily even during extended stays and knew the staff intimately given the length of their stay(s) and frequency with which they interacted. Given the facts above, Defendant had actual or constructive knowledge that Plaintiff was being forcibly trafficked for commercial sex.

140. The above facts satisfy the fourth element of a knowing beneficiary claim under the TVPRA as to the Plaintiff. See *W.K. v. Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1371 (N.D. Ga. 2023) (finding sufficient evidence of defendants' knowledge of a TVPRA violation where, *inter alia*, commercial sex at the hotel was "obvious" to employees, hotel employees had commercial sex with a plaintiff, and the defendants had an ongoing relationship with plaintiffs' traffickers); *H.B. v. Red Roof Inns, Inc.*, No. 1:22-cv-1181-JPB, Doc. 158 at 18 (N.D. Ga. June 17, 2024) (finding sufficient evidence as to the fourth TVPRA element where hotel employees provided lookout services and assisted in facilitating the trafficking operation).

141. Actual knowledge requires an awareness or understanding of a fact or circumstance. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725. Whereas constructive knowledge is that knowledge which one using reasonable care or diligence should have. *Id.*

142. Here, Plaintiff specifically alleges that Harboring Defendant actually knew and should have known that its undertaking or enterprise with Plaintiff's Traffickers would violate the TVPRA. Therefore, the knowledge element for beneficiary liability is satisfied as the higher standard has been pled.

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4ᵗʰ Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

143. However, the acts set forth above, at the very least, show that Harboring Defendant had constructive knowledge that Plaintiff would be sex trafficked. General allegations of knowledge are sufficient under the TVPRA to meet the knowledge element under the statute. *C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1297 (M.D. Fla. 2021) (citing *Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, LLC, 904 F.3d 1197, 1215 (11th Cir. 2018)).

144. Defendant's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendant had a statutory obligation not to benefit financially or receive anything of value from a venture that it knew, or should have known, engaged in violating the TVPRA.

WHEREFORE, Plaintiff ██ED demands judgment for damages against Defendant, CPLG WEST PALM BEACH L.L.C., in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorney's fees if allowable by law, and such other and further relief as the Court deems just and proper, both in law and in equity. The Plaintiff further demands trial by jury as to all issues triable as a matter of right to a jury.

**CAUSATION AND DAMAGES**

145. Plaintiff ██ED/ was harbored at Harboring Defendant's hotel where she was seriously and permanently injured as a direct result of the Harboring Defendant's acts and omissions, in that the Harboring Defendant knowingly permitted, harbored and facilitated illegal sex trafficking ventures to take place at the Defendant's hotel whereby the Plaintiff ██ was routinely and continuously abused, battered, falsely imprisoned, raped, beaten, starved, forcibly injected with drugs and enslaved.

146. Under the TVPRA, Harboring Defendant(s) are jointly and severally liable for all

damages a jury awards to ███ for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

147. More specifically, at all material times, in the quest for profits, the acts and omissions of the Harboring Defendant caused the Plaintiff to suffer:

    a.   Forced labor;

    b.   Forced confinement without safe means of escape;

    c.   Assault and fear;

    d.   Sickness, dizziness and headaches;

    e.   Cuts, lacerations, abrasions and other physical harm;

    f.   Mental anguish, humiliation, exploitation, degradation and mental distress;

    g.   Suffocation, battery, sexual assault and rape;

    h.   Shock, fright and post-traumatic stress;

    i.   Overdose and drug-induced dangers;

    j.   Forced (sexual) slavery; and

    k.   Invasion of privacy.

148. As a direct and proximate result of Defendant's acts and omissions Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

149. Defendant is jointly and severally liable with Plaintiff's Traffickers and any other non-party actors who participated in the trafficking for the indivisible injuries that the venture proximately caused to Plaintiff.

150. Plaintiff brings each and every claim for damages permissible under the law against the Harboring Defendant, who are jointly and severally liable, for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical

expenses, necessary expenses, and all compensatory, special, actual, general, and consequential damages permissible under the law, including, but not limited to the following actual past, present and future damages:

    a. Personal injuries;

    b. Past, present and future pain and suffering;

    c. Disability;

    d. Disfigurement;

    e. Mental anguish;

    f. Loss of the capacity for the enjoyment of life;

    g. Loss of earning capacity;

    h. Lost wages;

    i. Direct damages;

    j. Incidental and consequential damages;

    k. Emotional distress damages;

    l. Necessary medical expenses;

    m. Life care expenses;

    n. Physical pain and suffering;

    o. Physical impairment;

    p. Attorneys' fees as allowed by law;

    q. Costs of this action; and

    r. Pre-judgment and all other interest recoverable as a matter of law;

151. The injuries and harms that ████████. suffered as a result of the Harboring Defendant's negligent operation of the harboring hotel and failure to make the hotel

▪ **VICTIM'S VOICE, LLC** ▪

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

premises safe, are of a permanent and/or continuing nature.

152. Each of the forgoing acts and omissions constitute an independent act of negligence on the part of the Defendant, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by the Plaintiff.

**<u>JURY DEMAND</u>**

153. ███ requests trial by jury.

WHEREFORE, Plaintiff prays for a judgment against the Defendant and for the following:

1) That process and summons issue requires Defendant to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiff be awarded actual damages in amounts to be shown at trial;

3) Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

4) Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

5) Plaintiff be provided with a trial by jury; and

6) Plaintiff have such other further legal and equitable relief as this Court deems just and appropriate under the circumstances.

DATED this 26th day of August, 2025.

Victim's Voice, LLC
**Attorneys for Plaintiff**
100 N. Federal Hwy, 4th Floor
Fort Lauderdale, FL 33301
Telephone: 754.335.4700
Facsimile: 954.994.0040
Primary email: anthony@victimsvoice.law
Secondary email: vv.001@victimsvoice.law

By: /s/: Anthony Chiarello
Anthony Chiarello, Esq.
Florida Bar No.: 73760

▪ **VICTIM'S VOICE, LLC** ▪

R.R.,

       Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

       Defendant.

_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

# MOTION FOR PROTECTIVE ORDER

Case 9:25-cv-81390-AHS   Document 1-1   Entered on FLSD Docket 11/04/2025   Page 56 of 138

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. _____

███

Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delware limited liability company,

Defendant.

_____/

## PLAINTIFF'S MOTION FOR PROTECTIVE ORDER AND LEAVE TO PROCEED VIA INITIALS WITH BRIEF IN SUPPORT

### INTRODUCTION

Plaintiff, ███, requests leave to bring this action anonymously in accordance with the Florida Rules of Judicial Administration and Civil Procedure, and for Defendant to be ordered to keep Plaintiff's identity confidential throughout the discovery process and until the Court further addresses the issue with the benefit of a full record.  Regardless of the outcome of this motion, Plaintiff agrees to disclose her name to the Defendant.

### FACTS

As described thoroughly in the Complaint, Plaintiff was ripped from her home and sex trafficked as a minor, ostensibly forced to be a sex slave to many hundreds if not thousands of men over many years. During this time, she was forced to engage in illegal activities against her will, and she is at massive risk of retaliation by the traffickers that once imprisoned her; there is also significant risk to the victims still being trafficked by Plaintiff's traffickers and public policy

▪ **VICTIM'S VOICE, LLC** ▪
**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

1

supports confidentiality to encourage other victims to come forward with their own claims.

Given the extremely intimate and private nature of the information Plaintiff must disclose to prosecute her case, her age, risk of retaliation against her and other innocent victims, and based on advice of counsel, Plaintiff does not wish to be publicly identified as a sex trafficking victim although she agrees to disclose her name to the Defendant.

**<u>LEGAL ARGUMENT</u>**

1. Florida R. Civ. P. 1.100(c) states:

   > Every pleading, motion, order, judgment, or other paper shall have a caption containing ... the name of the first party on each side with an appropriate indication of other parties, and a designation identifying the party filing it.... All papers filed in the action shall be styled in such a manner as to indicate clearly the subject matter of the paper and the party requesting or obtaining relief.

2. Florida R. Civ. P. 1.020 requires all court filings to comply with Fla. R. Jud. Admin. 2.425. *See* Fla. R. Civ. P. 1.020. Fla. R. Jud. Admin. 2.425 provides, in pertinent part:

   > (a) Limitations for Court Filings. Unless authorized by subdivision (b), statute, another rule of court, or the court orders otherwise, designated sensitive information filed with the court must be limited to the following format:

   > (1) The initials of a person known to be a minor;
   > Fla. R. Jud. Admin. 2.425 ("Rule 2.425").

3. Next, Florida Rule of Judicial Administration 2.420 provides that "protected information regarding victims of child abuse or sexual offenses §§ 119.071(2)(h), 119.0714(1)(h), Fla. Stat," shall be confidential. Fla. R. Jud. Admin. 2.420(d)(l)(B)(xiii).

4. Section 119.071(2)(h) provides that the following information is confidential:

   > a. Any information, including the photograph, name, address, or other fact, which reveals the identity of the victim of the crime of child abuse as defined by chapter 827 or that reveals the identity of a person under the age of 18 who is the victim of the crime of human trafficking proscribed in

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4ᵗʰ Floor, Fort Lauderdale, FL 33301 • Phone: 754-335-4700**

s. 787.06(3)(a).

b. Any information which may reveal the identity of a person who is a victim of any sexual offense, including a sexual offense proscribed in chapter 794 [Sexual Battery], chapter 796 [Prostitution], chapter 800 [Lewdness; Indecent Exposure], chapter 827 [Abuse of Children], or chapter 847 [Obscenity].
§119.071 (2)(h), Florida Statutes.

5. Section 119.0714(1)(h) provides that information that is confidential pursuant to section 119.071(2)(h) is exempt from disclosure as a public record. *See* section 119.0714(1)(h), Florida Statutes.

6. Further, the trial court has inherent powers to protect the interests of similarly situated Plaintiffs. *See* Slate, By & Through Office of State Attorney for Twentieth Judicial Circuit v. Sievert, 312 So. 2d 788, 791 (Fla. 2d DC A 1975) (recognizing inherent authority of the court to act whenever necessary to protect the interests of minors); cf. Barron v. Florida Freedom Newspapers, Inc., 531 So. 2d 113, 118 (Fla. 1988) (acknowledging that despite strong presumption of openness for all court proceedings, the court may order closure of court proceedings or records to comply with established public policy).

7. Therefore, as per the Florida Rules of Civil Procedure and Judicial Administration, this court is empowered to keep Plaintiff's identity confidential; additionally, the Court has inherent authority to close proceedings and keep Plaintiff's identity confidential to comply with public policy.

8. The Federal Rules of Civil Procedure, from which Florida mirrored its Rules of Civil Procedure, follow a similar scheme and require that "every pleading" "must name all the parties." Fed. R. Civ. P. 10(a). Doe v. Frank, 951 F.2d 320, 322 (11th Cir. 1992).

9. The "ultimate test for permitting a plaintiff to proceed anonymously is whether the plaintiff

has a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness'" in judicial proceedings. Doe v. Frank, 951 F.2d 320, 323 (11th Cir. 1992). "In evaluating whether a plaintiff has shown that [s]he has such a right, the court should carefully review all the circumstances of a given case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns."

10. In Plaintiff B v. Francis, the Eleventh Circuit sets forth a three-part test to evaluate a plaintiff's claim of a substantial privacy right in order to proceed anonymously in a civil suit:

> First, are the plaintiffs seeking anonymity challenging governmental activity? Second, will they be required to disclose information of the utmost intimacy? Third, will the plaintiffs be compelled to admit their intention to engage in illegal conduct and thus risk criminal prosecution? Plaintiff B v. Francis, 631 F.3d 1310, 1315-1316 (11th Cir. 2011).

11. The Eleventh Circuit also held that, along with these factors, a court "should carefully review all the circumstances of a given case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns." S.B. v. Fla. Agric. & Mech. Univ. Bd. of Trs., 823 F. App'x 862 (11th Cir. 2020) (quoting Francis, 631 F.3d at 1316).

12. In Francis, the Circuit court determined Plaintiff's identity should remain confidential even though "[t]he only relevant consideration of the three-part SMU [S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe, 599 F.2d 707, 713 (5th Cir. 1979)] test here is the second question: would denying the plaintiff's anonymity at trial require them to disclose information of utmost intimacy." ("[T]he district court gave inadequate consideration to the degree of intimacy the Plaintiffs' testimony would reach. ... Where

the issues involved are matters of a sensitive and highly personal nature … the normal practice of disclosing the parties' identities yields to a policy of protecting privacy in a very private matter.") (Plaintiff B v. Francis, 631 F.3d 1310, 1316-17 (11th Cir. 2011))

13. The Eleventh Circuit also clarified that "[a]fter the Stegall court clarified that the three-part SMU test was only the first step for evaluating whether to let a plaintiff proceed to trial anonymously, courts have considered other contexts in analyzing all the circumstances of a given case. Courts have looked at factors such as whether the plaintiffs were minors, Stegall, 653 F.2d at 186, whether they were threatened with violence or physical harm by proceeding in their own names, *id*., and whether their anonymity posed a unique threat of fundamental unfairness to the defendant. *See* SMU, 599 F.2d at 713.

14. In the present case, the test factors fall strongly in favor of Plaintiff's confidentiality (there is no more intimate and private information than what Plaintiff will be disclosing; Plaintiff and other innocent victims are at an extreme risk of harmful retaliation; Plaintiff's young age; Defendant will be provided with identifying information and will not be prejudiced; public policy supports confidentiality to encourage other victims to come forward with their own claims).

15. Plaintiff's request for confidentiality is no broader than what is necessary to protect her and no less restrictive measures are available.

## CONCLUSION

Based on the foregoing, Plaintiff requests this Court grant her leave to proceed confidentially under a pseudonym until further order of this Court so that the parties can establish a record on the issue of whether the potential harm the victim would suffer from disclosure outweighs the presumption of openness to the public and harm to the Defendant.

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 • Phone: 754-335-4700**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via the Florida E-Portal with the Complaint on August 26, 2025.

Victim's Voice, LLC
**Attorneys for Plaintiff**
100 N. Federal Hwy, 4th Floor
Fort Lauderdale, FL 33301
Telephone: 754.335.4700
Facsimile: 954.994.0040
Primary email: anthony@victimsvoice.law
Secondary email: vv.001@victimsvoice.law

By: */s/: Anthony Chiarello*
Anthony Chiarello, Esq.
Florida Bar No.: 73760

R.R.,

      Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

      Defendant.

_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

# UNIFORM DIFFERENTIATED CASE MANAGEMENT ORDER AND ORDER SETTING TRIAL

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AD"
CASE NO.: 502025CA008675XXXAMB

███        Plaintiff/Petitioner

vs.

CPLG WEST PALM BEACH LLC,
        Defendant/Respondent.

_____/

### UNIFORM DIFFERENTIATED CASE MANAGEMENT ORDER
### AND ORDER SETTING TRIAL
(DCMGJT)

   **THIS MATTER** is a Circuit Civil case calling for a jury trial. Pursuant to Fla. R. Gen.
Prac. & Jud. Admin. 2.250(a)(1)(B) and 2.545(b), and Fifteenth Judicial Circuit Administrative
Order 3.110 (as amended), **Plaintiff/Petitioner is directed to serve this Order upon each
Defendant/Respondent with the initial Complaint/Petition and Summons**.

   It is hereby **ORDERED AND ADJUDGED** that this case is designated to the **GENERAL
TRACK** for time to disposition. The deadlines and procedures set forth in this Order will be
strictly enforced unless changed by court order.

Consistent with the Professionalism Expectations of the Florida Supreme Court and the Florida
Bar, the parties and counsel are expected to govern themselves at all times with a spirit of
cooperation, professionalism and civility. They are expected to accommodate each other whenever
reasonably possible and eliminate disputes by reasonable agreements. Self-Represented/*Pro Se*
Litigants (i.e., those without counsel) are held to the same procedural and legal obligations as are
imposed upon counsel.

I. <u>SCHEDULING</u>

   A. **Calendar Call**

      **YOU MUST APPEAR FOR A MANDATORY CALENDAR CALL on April 30,
      2027 at 8:00 am**. The parties must be ready to try the case by that date. The actual
      trial period begins on the docket associated with this Calendar Call date as provided
      in Divisional Instructions or by court order.

      Calendar Call may be conducted in person, via Zoom or by e-calendar. All parties are
      instructed to review the Court's Divisional Instructions for specific procedures at
      www.15thcircuit.com/divisions.

Case No. 50-2025-CA-008675-XXXA-MB

At the Calendar Call, the Court may conduct a final case management conference. Attorneys who appear for Calendar Call must be prepared on all pending matters and have authority to make representations to the Court and enter into binding agreements concerning motions, issues, and scheduling. These include issues raised by the parties' Pre-Trial Stipulation; trial procedures; jury selection procedures; jury instructions and objections; and the need for any special equipment, courtroom facilities, or interpreters. An appearing attorney must be prepared to advise the Court of all attorneys' availability for trial and future hearings as necessary.

**This Order serves as notice to the parties that failure to attend Calendar Call will result in an Order of Dismissal without prejudice, or entry of default, without further notice or hearing.** *See* Fla. R. Civ. P. 1.200(j)(6).

B. **Case Management Deadlines**

The following deadlines strictly apply unless otherwise modified by the Court:

| | EVENTS | COMPLETION DEADLINE |
|---|---|---|
| 1. | Service of Complaint | December 24, 2025; service under extension is only by court order. |
| 2. | Answer and/or initial motions/objections directed to the pleadings (i.e. to dismiss or strike) | 20 days after service |
| 3. | Initial Discovery Disclosures | 60 days after service |
| 4. | Amendment of pleadings/Adding parties | May 3, 2026 |
| 5. | Resolution of all motions/objections directed to the pleadings and pleadings closed | June 22, 2026 |
| 6. | Disclosure of Expert Witness(es) | October 12, 2026 |
| 7. | Disclosure of Rebuttal Experts | November 11, 2026 |
| 8. | Inspections, Expert Witness Depositions and Compulsory Examinations completed | January 30, 2027 |
| 9. | File Witness & Exhibit Lists | February 9, 2027 |
| 10. | Completion of Discovery relating to Summary Judgment and *Daubert* Motions | January 30, 2027 |
| 11. | File and Serve Motion(s) for Summary Judgment and *Daubert* Motions | February 9, 2027 |
| 12. | File Rebuttal Witness Lists | March 1, 2027 |
| 13. | Completion of All Discovery | March 21, 2027 |
| 14. | Pre-Trial Meet & Confer | March 31, 2027 |
| 15. | File all Pre-Trial Motions (i.e. Motions in Limine) | March 31, 2027 |
| 16. | Deadline for Mediation | April 20, 2027 |
| 17. | Deposition Designations | April 20, 2027 |
| 18. | File Joint Pre-Trial Stipulation | April 20, 2027 |

Case No. 50-2025-CA-008675-XXXA-MB

| 19. | Deadline to hear ALL Motions | April 25, 2027 |
| 20. | Jury Instructions and Verdict Form | April 27, 2027 |
| 21. | Calendar Call/Trial Ready Date | April 30, 2027 |
| 22. | Trial Period | Begins on the docket associated with the above Calendar Call date, as provided in Divisional Instructions or by court order. |

**Note: If the above deadlines fall on a weekend or holiday, please refer to Fla. R. Gen. Prac. & Jud. Admin. 2.514.**

The parties are expected to actively manage the case and to confer early and often to ensure compliance with the Florida Rules of Civil Procedure and this order in timely resolving this case. **The parties are encouraged to file, meet, and make disclosures prior to the deadlines imposed above, in order to ensure compliance with the Rules requiring timely disposition of cases**.

The Court may, at any time, modify this Order by entry of: 1) an Amended Trial Order, 2) an Amended Case Management Order; or 3) any other Order intended to establish a modified case resolution schedule, any of which shall supersede the deadlines set forth in this Order. The Court reserves the authority to expedite the trial setting and amend pretrial deadlines accordingly. The Court further retains its discretion to modify any provision herein.

C. **Motions**

Unless court approval is required to set a particular motion for hearing, the parties must expeditiously set all contested motions for hearing. All non-dispositive motions, including motions directed to the pleadings, must be scheduled for hearing within **five (5) days** of filing. Parties shall schedule the hearing for the first vacancy on the Court's docket when all parties are available. **Failure to schedule a hearing within five (5) days may result in the Court deeming the motion(s) abandoned without further notice or hearing**.

The moving party shall be the party responsible for securing the presence of a court reporter. The moving party shall advise all parties in writing in advance of the hearing or trial of the arrangements made, if any, for the presence of a court reporter, or shall advise all parties in advance of the hearing or trial that the moving party has chosen not to obtain a court reporter.

Before filing a non-dispositive motion, the movant must follow Rule 1.202 and Local Rule 4. Failure to comply with the requirements of Rule 1.202 and Local Rule 4 may result in sanctions against the non-compliant party.

The requirements of Rule 1.202 do not apply when the movant or the nonmovant is unrepresented by counsel *(pro se)*.

Page 3 of 11

D. **Extensions, Modifications and Continuances**

**Extensions of Deadlines Other than Trial/Calendar Call: All motions to extend deadlines must be filed prior to the deadline**. Untimely motions will be denied absent compelling circumstances and a showing of good cause.

The parties must strictly follow Rule 1.200(e) and Administrative Order 3.110 (as amended) when filing motions for extension or modification. If the parties agree, and the extension will not prevent the case from being trial ready by the original Calendar Call date, the parties may file a motion and submit for the Court's consideration an agreed order or proposed Amended DCMO, as applicable under Rule 1.200(e)(1). The motion shall identify which deadlines are requested to be extended and the basis for the request. Each agreed order or Amended DCMO must contain agreed-upon dates for all remaining deadlines and confirm that the Calendar Call date remains as previously set. The Court will accept the amendment or direct the parties to set a DCM Conference. **Agreements to extend the dates for the filing of Summary Judgment and *Daubert* motions, and for completion of discovery, must be set for hearing, and the parties must be prepared to address how the proposed extension will not affect the Calendar Call date.**

**Motions to Continue Trial:** Motions to continue trial must strictly comply with Rule 1.460. **Motions to continue are disfavored and will rarely be granted and then only upon good cause shown. Successive continuances are highly disfavored. Lack of due diligence in preparing for trial is not grounds to continue the case**. Failure to timely complete discovery and/or file a motion for summary judgment shall not be grounds to continue the trial.

E. **DCM Conferences**

If any party is unable to meet the deadlines set forth in this Order for any reason, including unavailability of hearing time, the affected party must promptly set a DCM conference as described in Administrative Order 3.110 (as amended), identifying the hearing time requested and the pending motion(s). DCM conferences shall be scheduled through online scheduling (OLS) on either the Court's: 1) DCM - Case Management Conference docket; or 2) Uniform Motion Calendar, in accordance with Divisional Instructions.

II. **UNIFORM PRE-TRIAL PROCEDURE**

A. TIMELY SERVICE AND DEFAULTS

Parties must make reasonable efforts to ensure speedy service. Each return of service must be separately filed for each defendant. If service is not completed within ninety (90) days, an Order will be issued directing service by the **ONE-HUNDRED TWENTY (120) DAY DEADLINE.** Failure to comply will result in dismissal of the case or party for lack of service. Any motions to extend the deadline for service must specify why service could not have been effectuated, what is being done to effectuate service and request only that amount of additional time necessary.

If all defendants become defaulted, a Motion for Default Final Judgment along with supporting documentation must be filed within **thirty (30) days** of the last default and set for hearing at the next available hearing time.

B.  INITIAL DISCLOSURES

Within **sixty (60) days after service** on a defendant, and except as exempted by Rule 1.280(a)(2) or as ordered by the court, each party must, without awaiting a discovery request, provide to the other parties initial discovery disclosures in compliance with Rule 1.280(a), unless privileged or protected from disclosure.

C.  EXHIBITS AND WITNESSES

No later than **eighty (80) days before Calendar Call**, each party shall file and exchange lists of all trial exhibits, names, and addresses of all trial witnesses. Each party's witness list must include a brief description of the substance and scope of the testimony to be elicited from each witness. Both sides must cooperate in the scheduling of all witness depositions.

Each party's exhibit list shall include each exhibit separately numbered and identified. Generic or prospective designations are not allowed (e.g. insurer's file, documents to be produced, etc.). Each party shall provide for a reasonable time and place for the other parties to review and copy the exhibits.

D.  EXPERT WITNESS DISCLOSURES

In addition to the names and addresses of each expert retained to formulate an expert opinion, as well as any hybrid fact/expert witnesses, no later than **two-hundred (200) days before Calendar Call**, the parties must provide:

1.  The subject matter about which the expert will testify;
2.  The opinions to which the expert will testify;
3.  A summary of the grounds and facts for each opinion; and
4.  A copy of the expert's curriculum vitae.

**Each expert will be limited to testifying only about those matters which have been fully disclosed.**

Parties shall furnish opposing counsel with two (2) alternative dates of availability of all expert witnesses for the purpose of taking their deposition. All parties shall cooperate in the scheduling of expert depositions.

The parties shall also provide answers to standard form expert interrogatories. All reports or other data compiled by each disclosed expert which are intended to be used by the expert and/or referred to during his/her deposition testimony shall be provided electronically to all opposing parties at least 72 hours prior to the date of the

scheduled deposition.

**Rebuttal/Responsive Experts**

No later than **one-hundred seventy (170) days before Calendar Call**, the parties shall provide opposing counsel with a written list with the names and addresses of all rebuttal/responsive expert witnesses intended to be called at trial and only those rebuttal/responsive expert witnesses listed shall be permitted to testify. The parties shall also furnish opposing counsel with expert reports or summaries of all rebuttal/responsive expert witnesses' anticipated testimony to the same extent as the expert disclosure requirement above.

Within **thirty (30) days** following this disclosure, the parties shall make their rebuttal/responsive experts available for deposition. The experts' depositions may be conducted without further Court order.

E. REBUTTAL FACT WITNESSES AND EXHIBITS

No later than **sixty (60) days before Calendar Call**, the parties must file and exchange lists of names and addresses of all rebuttal fact witnesses and lists of any rebuttal exhibits.

F. ADDITIONAL EXHIBITS, WITNESSES OR OBJECTIONS

At trial, the parties will be strictly limited to exhibits and witnesses previously disclosed absent agreement of the parties or order of the Court upon good cause shown. A party desiring to use an exhibit or witness discovered after counsel have conferred must immediately furnish the Court and other counsel with a description of the exhibit or with the witness' name and address and the expected subject matter of the witness' testimony, together with the reason for the late discovery of the exhibit or witness. Failure to reserve objections constitutes a waiver. Use of the exhibit or witness may be allowed by the Court for good cause shown.

G. DEPOSITION DESIGNATIONS

No later than **ten (10) days prior to Calendar Call**, each party must serve deposition designations, or portions of depositions, each intends to offer as testimony. No later than **eight (8) days prior to Calendar Call**, each opposing party is to serve any counter (or "fairness") designations, together with objections to the depositions, or portions thereof, originally designated. No later than **five (5) days before Calendar Call**, each party must serve any objections to counter-designations served by an opposing party.

H. DISCOVERY COMPLETION

All discovery relating to Summary Judgment and *Daubert* motions must be

completed no later than **ninety (90) days prior to Calendar Call**.

All discovery must be completed no later than **forty (40) days prior to Calendar Call**.

Rulings as to admission on late discovery will be made on a case by case basis. Absent unforeseeable, exigent circumstances, the failure to complete discovery is not grounds for a continuance.

I.  <u>COUNSEL MEETING AND PRE-TRIAL STIPULATION</u>

Counsel or the parties, if not represented by counsel, shall meet in person at a mutually convenient time and place no later than **thirty (30) days before Calendar Call** to discuss settlement, simplify the issues, and stipulate to as many facts and issues as possible, and prepare a Pre-Trial Stipulation in accordance with this paragraph.

It shall be the duty of Plaintiff's counsel to see that the Pre-Trial Stipulation is drawn, executed by counsel for all parties, and filed with the Clerk no later than **ten (10) days prior to Calendar Call. UNILATERAL PRE-TRIAL STIPULATIONS ARE DISALLOWED, UNLESS APPROVED BY THE COURT AFTER NOTICE AND HEARING**. If a party does not receive a substantive response to a proposed Pre-Trial Stipulation after good faith effort, such party shall file a unilateral Pre-Trial Stipulation with a certification of all efforts that were made to confer with the opposing party. Counsel for all parties are charged with good faith cooperation in preparing the Pre-Trial Stipulation, and the parties shall make exhibits available for inspection and copying. Failure to cooperate in preparing the Pre-Trial Stipulation may result in striking pleadings, witnesses, or exhibits.

The Pre-Trial Stipulation must contain the following in separately numbered paragraphs:

1.  Names and contact information of attorneys to try case.
2.  A list of all pending motions requiring action by the Court. **Motions not listed are deemed abandoned or waived**.
3.  A statement of estimated trial time, including the total number of trial days anticipated, and the time needed per side for (1) jury selection, (2) opening arguments, (3) each case in chief, and (4) closing arguments.
4.  **Statement of the Facts:** A concise statement of the facts in an impartial, easily understandable manner which may be read to the jury.
5.  **Statement Facts and Agreed Rules of Law:** A list of any stipulated facts requiring no proof at trial and any agreed rules of law.
6.  **Statements of Disputed Law & Fact:** A statement of disputed issues of law and fact that are to be tried.
7.  **Witness Lists:** Parties must attach their previously filed Witness Lists, including rebuttal or impeachment witnesses. If any party objects to any

witness, such objections must be stated in the Stipulation, setting forth the grounds with specificity. At trial, all parties will be strictly limited to witnesses properly and timely disclosed. Only those witnesses listed by NAME will be permitted to testify at trial.

8. **Exhibit Lists:** Parties must attach their previously filed Exhibit Lists. All exhibits to be offered in evidence at trial must have been made available to opposing counsel for examination. Only those exhibits listed may be offered in evidence. If any party objects to the introduction of any such exhibit, such objection must be stated in the Pre-Trial Stipulation, setting forth the grounds with specificity. Demonstrative exhibits (e.g. PowerPoints, charts, enlargements of exhibits) to be used at a Jury Trial must be displayed to all counsel before being shown to the jury. All exhibits must be pre-marked and numbered consistent with Clerk guidelines.

9. **Jury Instructions:** Counsel must identify all agreed-upon standard jury instructions and all special instructions. Any objections or disputed jury instructions must be attached and identified as to the party that proposed the instruction [indicated in redline/track changes]. Copies of all agreed-upon instructions or disputed instructions must be attached to the Stipulation as one document, redlined as necessary, along with copies of supporting statutory citations and/or case law.

10. **Verdict Forms:** The jury verdict form must be attached and designated as agreed to or disputed.

11. **Peremptory Challenges:** State the number of peremptory challenges for each party.

12. Other agreements or issues for trial, if any.

Failure to file a Joint Pre-Trial Stipulation as provided above may result in Court-imposed sanctions, including dismissal or default without further notice of the Court.

J. MOTIONS

**Summary Judgment and *Daubert* Motions** must be filed at least **eighty (80) days before Calendar Call**. The parties shall confer regarding summary judgment motions to ensure discovery necessary for those motions is completed in advance of their filing.

**ALL MOTIONS** (including dispositive motions and motions in limine), deposition objections, and expert challenges must be filed, served and heard at least **five (5) days before Calendar Call**.

K. PRE-MARKING EXHIBITS

Prior to trial, each party is to mark for identification all exhibits in accordance with the guidelines of the Clerk of Court. Instructions and templates may be found at: www.mypalmbeachclerk.com/departments/courts/evidence-guidelines/civil-evidence.

L. ENLARGED JURY PANELS

Local Rules require advance approval of the Chief Judge and Jury Office for jury panels exceeding 31 jurors. **To ensure enough jurors are available, requests for enlarged jury panels must be resolved at least six (6) months before Calendar Call**. Failure to timely request an enlarged panel may result in Court-ordered sanctions, including a limitation on peremptory challenges.

M.  <u>INTERPRETERS</u>

Unless otherwise ordered by the Court, it shall be the responsibility of the party who needs the services of an interpreter, whether for a litigant or for a witness, to have a competent interpreter present in court.

N.  <u>JURY INSTRUCTIONS AND VERDICT FORM</u>

A joint set of proposed jury instructions and a proposed verdict form must be provided to the court no less than **three (3) days before Calendar Call** in a printed form appropriate for submission to the jury and in Microsoft Word format.

If there is an objection to a proposed instruction, the instruction should be followed by the specific objection, a brief explanation, and a citation to legal authority. If an alternative or modified instruction is proposed, it should follow the instruction it is intended to replace.

O.  <u>UNIQUE QUESTIONS OF LAW</u>

Prior to calendar call, counsel for the parties are directed to exchange and simultaneously submit to the Court appropriate memoranda with citations to legal authority in support of any unique legal questions that may reasonably be anticipated to arise during the trial.

III.  **<u>MEDIATION</u>**

A.  <u>MEDIATION REQUIRED</u>

1.  All parties are required to participate in mediation.
2.  The attendance of counsel who will try the case and representatives of each party with full authority to enter into a complete compromise and settlement is mandatory. If insurance is involved, an adjuster with authority up to the policy limits must attend.
3.  At least one week prior to a scheduled mediation conference, all parties are to file with the mediator a brief, written summary of the case containing a list of issues as to each party.
4.  All communications at the mediation conference are privileged consistent with Florida Statutes sections 44.102 and 90.408.
5.  The mediator has no power to compel or enforce a settlement agreement. If a

Case No. 50-2025-CA-008675-XXXA-MB

settlement is reached, it is a responsibility of the attorneys or parties to reduce the agreement to writing and to comply with Florida Rule of Civil Procedure 1.730(b), unless waived.

B. MEDIATION SCHEDULING

**The Plaintiff's attorney is responsible for scheduling mediation**. The parties should agree on a mediator. If they are unable to agree, any party may apply to the Court for appointment of a mediator in conformity with Rule 1.720 (j), Fla. R. Civ. P. The lead attorney or party must file and serve on all parties and the mediator a Notice of Mediation giving the time, place, and date of the mediation and the mediator's name.

C. COMPLETION OF MEDIATION BEFORE CALENDAR CALL

Completion of mediation prior to calendar call is a prerequisite to trial and must be completed no later than **ten (10) days prior to Calendar Call**. If mediation is not conducted, or if a party fails to participate in mediation, the Court may impose sanctions, including monetary sanctions, striking pleadings and witnesses, and dismissal or default without further notice of the Court.

D. OPPOSITION TO MEDIATION

Any party opposing mediation may proceed under Florida Rule of Civil Procedure 1.700(b).

IV. **NON-COMPLIANCE**

**NON-COMPLIANCE WITH ANY PORTION OF THIS ORDER MAY RESULT IN THE STRIKING OF THE PLEADINGS, WITNESSES, OR EXHIBITS, ENTRY OF DEFAULT OR DISMISSAL WITHOUT FURTHER NOTICE OF THE COURT, OR IMPOSITION OF SUCH OTHER SANCTIONS AS IS JUST AND PROPER.**

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida.

50-2025-CA-008675-XXXA-MB   08/27/2025
Jaimie R. Goodman   Circuit Judge

50-2025-CA-008675-XXXA-MB   08/27/2025
Jaimie R. Goodman
Circuit Judge

A copy of this Order has been furnished to the Plaintiff. The Plaintiff shall serve this Order to the Defendant(s) in compliance with Administrative Order 3.110 (amended).

# ADA NOTICE

Case No. 50-2025-CA-008675-XXXA-MB

This notice is provided pursuant to Administrative Order No. 2.207-7/22

"**If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**"

"**Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**"

"**Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.**"

R.R.,

      Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

      Defendant.

_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB


# FILING RECEIPT NO. 5927107



# RECEIPT
5927107

## CLERK OF THE CIRCUIT COURT & COMPTROLLER
## PALM BEACH COUNTY, FLORIDA

Printed On:
08/27/2025 09:30
Page 1 of 1

| Receipt Number: 5927107 - Date 08/27/2025  Time 9:30AM | | | |
|---|---|---|---|
| **Received of:** | Madalon Law<br>100 N Federal Hwy<br>CU5<br>Fort Lauderdale, FL 33301 | | |
| **Cashier Name:** | ADMIN | **Balance Owed:** | 401.00 |
| **Cashier Location:** | E-Filing | **Total Amount Paid:** | 401.00 |
| **Receipt ID:** | 12379890 | **Remaining Balance:** | 0.00 |
| **Division:** | AD: Circuit Civil Central - AD(Civil) | | |

| Case# 50-2025-CA-008675-XXXA-MB -- PLAINTIFF/PETITIONER ████ | | | |
|---|---|---|---|
| **Item** | **Balance** | **Paid** | **Bal Remaining** |
| Fees | 401.00 | 401.00 | 0.00 |
| **Case Total** | **401.00** | **401.00** | **0.00** |

| Payments | | |
|---|---|---|
| **Type** | **Ref#** | **Amount** |
| EFiling_ACH | 16134187 | 401.00 |
| **Total Received** | | **401.00** |
| **Total Paid** | | **401.00** |



**How was your service today?**  Please visit www.mypalmbeachclerk.com/survey or send your feedback to clerkweb@mypalmbeachclerk.com.
**For office locations and information about Clerk & Comptroller services:**
Visit www.mypalmbeachclerk.com or call (561) 355-2996.

NOT A CERTIFIED COPY

R.R.,

       Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

       Defendant.

_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

# CORPORATE SUMMONS

Case 9:25-cv-81380-AHS   Document 1-1   Entered on FLSD Docket 11/04/2025   Page 77 of 138

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

███████████

Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delware limited liability company,

Defendant.

_____/

**CORPORATE SUMMONS**

**THE STATE OF FLORIDA**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this Summons and a copy of the Complaint in this action on
Defendant by serving its Registered Agent:

**CPLG WEST PALM BEACH L.L.C.**
**c/o COGENCY GLOBAL INC.**
**115 N. CALHOUN STREET, SUITE 4**
**TALLAHASSEE, FL 32301**

Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney, Anthony Chiarello
Esq., whose address is:

VICTIM'S VOICE, LLC
100 N. FEDERAL HWY, 4th FLOOR
FORT LAUDERDALE, FL 33301

within twenty (20) days after service of this Summons on Defendant, exclusive of the day of service, and
to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney
or immediately thereafter.  If Defendant fails to do so, a default will be entered against Defendant for the
relief demanded in the Complaint.

WITNESS my hand and the Seal of this Court, this_____ day of _____2025.

JOSEPH ABRUZZO
Clerk of the Courts

By:_____
As Deputy Clerk

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 • Phone: 754-335-4700**

1

## IMPORTANT

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with this Court.  A phone call will not protect you; your written response, including the above case number and named parties, must be filed if you want the Court to hear your case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the Plaintiff's Attorney named above.

## IMPORTANTE

Usted ha sido demando legalmente.  Tiene veinte (20) dias, constados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentaria ante este tribunal.  Una llamada telefonica no lo protegera; si usted desea que el tribunal considera su defensa debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesada en dicho caso.  Si usted no contesta la demanda a tiempo, pudies perder el caso y podria ser despojado de sus ingresos y propiedades, or privado de sus deredchos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatements.  Si no conoce a un abogado puede llamar a una de las oficinas de asistencia legal que aparecen en la quia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney." (Demandate o Abogado del Demanadante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet'te citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite avec mention du numero de dossier ci-dessus et du nom des parties nomees ici, si vous souhaitez que le Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du Tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocats, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez do deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au corone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

████████

　　　　　Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delware limited liability company,

　　　　　Defendant.

_____/

## **CORPORATE SUMMONS**

**THE STATE OF FLORIDA**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this Summons and a copy of the Complaint in this action on Defendant by serving its Registered Agent:

**CPLG WEST PALM BEACH L.L.C.**
**c/o COGENCY GLOBAL INC.**
**115 N. CALHOUN STREET, SUITE 4**
**TALLAHASSEE, FL 32301**

Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney, Anthony Chiarello Esq., whose address is:

VICTIM'S VOICE, LLC
100 N. FEDERAL HWY, 4th FLOOR
FORT LAUDERDALE, FL 33301

within twenty (20) days after service of this Summons on Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.  If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the Complaint.

WITNESS my hand and the Seal of this Court, this **5TH** day of _____**SEP**_____2025.



**XXXXXXXX**
Clerk of the Courts

By: _____
As Deputy Clerk  **JOSIE LUCCE**

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 • Phone: 754-335-4700**

1

**IMPORTANT**

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with this Court.  A phone call will not protect you; your written response, including the above case number and named parties, must be filed if you want the Court to hear your case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the Plaintiff's Attorney named above.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**IMPORTANTE**

Usted ha sido demando legalmente.  Tiene veinte (20) dias, constados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentaria ante este tribunal.  Una llamada telefonica no lo protegera; si usted desea que el tribunal considera su defensa debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesada en dicho caso.  Si usted no contesta la demanda a tiempo, pudies perder el caso y podria ser despojado de sus ingresos y propiedades, or privado de sus deredchos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatements.  Si no conoce a un abogado puede llamar a una de las oficinas de asistencia legal que aparecen en la quia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney." (Demandate o Abogado del Demanadante).

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha**

▪ **VICTIM'S VOICE, LLC** ▪

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

**programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**

**IMPORTANT**

Des poursuites judiciaries ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet'te citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal. Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite avec mention du numero de dossier ci-dessus et du nom des parties nomees ici, si vous souhaitez que le Tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du Tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocats, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez do deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au corone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn tajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.**

R.R.,

      Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

      Defendant.

_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

# NOTICE OF SIMILAR CASES

Filing # 230644476 E-Filed 09/02/2025 01:00:52 PM

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

█████,

Plaintiff,

CASE NO. 50-2025-CA-008675-XXXA-MB

v.

CPLG WEST PALM BEACH L.L.C.,
a Delware limited liability company,

Defendant.

_____/

## NOTICE OF SIMILAR CASES

COMES NOW, Plaintiff, ████, by and through undersigned counsel, and hereby notices cases with common issues and subject matter filed in different divisions throughout Florida. As best as possible, the clerks of the various courts were notified of said cases upon filing:

**I.** **15th Judicial Circuit, Division AO**

████ v. WESTPORT PLACE PROPERTIES, LLC, et al., Case #50-2025-CA-008670-XXXA-MB

**II.** **15th Judicial Circuit, Division AH**

████ v. BRE FLORIDA WELLESLEY L.L.C., et al., Case #50-2025-CA-008693-XXXA-MB

**III.** **15th Judicial Circuit, Division AD**

████ v. CPLG WEST PALM BEACH L.L.C., Case #50-2025-CA-008675-XXXA-MB

**IV.** **15th Judicial Circuit, Division AJ**

████ v. WEST PALM HOTEL HOLDINGS, INC., et al., Case #50-2025-CA-008681-XXXA-MB.

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 • Phone: 754-335-4700**

1

**V.      17th Judicial Circuit, Division 12**

███ v.  ESA P PORTFOLIO L.L.C., Case #CACE25012732

**VI.     17th Judicial Circuit, Division 9**

███ v.  ESA P PORTFOLIO L.L.C., Case #CACE25012737

**VII.    17th Judicial Circuit, Division 18**

███ v.  DHM INVESTMENTS, INC., Case #CACE25012743

**VIII.   17th Judicial Circuit, Division 5**

███ v.  CPLG FL PROPERTIES L.L.C., Case # CACE25012745

**IX.     17th Judicial Circuit, Division 13**

███ v.  BRE/FLORIDA WELLESLEY L.L.C., et al., Case #CACE25012746

**X.      17th Judicial Circuit, Division 25**

███ v.  MOTEL 6 OPERATING L.P., et al., Case #CACE25012918

**XI.     17th Judicial Circuit, Division 13**

███ v.  G6 HOSPITALITY PROPERTY LLC, Case #CACE-25-012926

▪ **VICTIM'S VOICE, LLC** ▪

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

2

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 2, 2025, a copy of the foregoing was filed via the Florida

E-Filing Portal and served via E-Service to all counsel of record.

Victim's Voice, LLC
**Attorneys for Plaintiff**
100 N. Federal Hwy, 4th Floor
Fort Lauderdale, FL 33301
Telephone: 754.335.4700
Facsimile: 954.994.0040
Primary email: anthony@victimsvoice.law
Secondary email: vv.001@victimsvoice.law

By: */s/: Anthony Chiarello*
Anthony Chiarello, Esq.
Florida Bar No.: 73760

R.R.,

      Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

      Defendant.

_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

# SUMMONS RETURNED

## RETURN OF SERVICE

**State of Florida**                    **County of Palm Beach**                    **Circuit Court**

Case Number: 50-2025-CA-008675-XXXA-MB

Plaintiff:

▇▇▇▇▇▇

vs.

Defendant:
**CPLG WEST PALM BEACH, LLC., a Delaware limited liability company,**

For:
Anthony Chiarello, Esq.
VICTIM'S VOICE, LLC
100 N. Federal Hwy
4th Floor
Fort Lauderdale, FL 33301

FIS2025008222

Received by PROFESSIONAL PROCESS SERVERS & INVESTIGATORS, INC. on the 14th day of October, 2025 at 4:52 pm to be served on **CPLG WEST PALM BEACH L.L.C. c/o COGENCY GLOBAL INC., 115 N. CALHOUN STREET, SUITE 4, TALLAHASSEE, FL 32301.**

I, SHANNON MARY THOMAS, do hereby affirm that on the **16th day of October, 2025** at **2:00 pm, I:**

**CORPORATE / LLC:**  served by delivering a true copy of the **CORPORATE SUMMONS and COMPLAINT AND DEMAND FOR JURY TRIAL** with the date and hour of service endorsed thereon by me, to: **RHONDA BLACK** as **AUTHORIZED REPRESENTATIVE**  for the Registered Agent of CPLG WEST PALM BEACH L.L.C. c/o COGENCY GLOBAL INC.  at the address of: **115 N. CALHOUN STREET, SUITE 4, TALLAHASSEE, FL 32301**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 30+, Sex: F, Race/Skin Color: BLACK, Height: N/A, Weight: N/A, Hair: BLACK, Glasses: N

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served.  Under penalty of perjury I declare that the facts contained herein are true to the best of my knowledge.NO NOTARY REQUIRED PURSUANT TO F.S. 92.525(2).

**SHANNON MARY THOMAS**
Certified Process Server #285

**PROFESSIONAL PROCESS SERVERS & INVESTIGATORS, INC.
800 W. CYPRESS CREEK ROAD
SUITE 390
FORT LAUDERDALE, FL 33309
(954) 566-2523**

Our Job Serial Number: FIS-2025008222
Ref: 2025008222

NOT A CERTIFIED COPY

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0d

Filing # 230639026 E-Filed 09/02/2025 12:26:19 PM

| DELIVERED | 10/16/2025 2:00 PM |
|-----------|--------------------|
| SERVER    |                    |
| LICENSE   | Certified Process  |
|           | Server #285        |

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

████████

Plaintiff,

CASE NO. 50-2025-CA-008675-XXXA-MB

v.

CPLG WEST PALM BEACH L.L.C.,
a Delware limited liability company,

Defendant.

_____/

## CORPORATE SUMMONS

**THE STATE OF FLORIDA**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this Summons and a copy of the Complaint in this action on Defendant by serving its Registered Agent:

**CPLG WEST PALM BEACH L.L.C.**
**c/o COGENCY GLOBAL INC.**
**115 N. CALHOUN STREET, SUITE 4**
**TALLAHASSEE, FL 32301**

Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney, Anthony Chiarello Esq., whose address is:

VICTIM'S VOICE, LLC
100 N. FEDERAL HWY, 4th FLOOR
FORT LAUDERDALE, FL 33301

within twenty (20) days after service of this Summons on Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.  If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the Complaint.

WITNESS my hand and the Seal of this Court, this **5TH** day of **SEP**_____2025.



XXXXXXXXX
Clerk of the Courts

By: _____
As Deputy Clerk **JOSIE LUCCE**

---

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 • Phone: 754-335-4700**

1

FILED: PALM BEACH COUNTY, FL, CLERK OF THE CIRCUIT COURT, 09/02/2025 12:26:19 PM

**IMPORTANT**

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with this Court.  A phone call will not protect you; your written response, including the above case number and named parties, must be filed if you want the Court to hear your case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the Plaintiff's Attorney named above.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

**IMPORTANTE**

Usted ha sido demando legalmente.  Tiene veinte (20) dias, constados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentaria ante este tribunal.  Una llamada telefonica no lo protegera; si usted desea que el tribunal considera su defensa debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesada en dicho caso.  Si usted no contesta la demanda a tiempo, pudies perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus deredchos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatements.  Si no conoce a un abogado puede llamar a una de las oficinas de asistencia legal que aparecen en la quia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney." (Demandate o Abogado del Demandante).

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha**

▪ **VICTIM'S VOICE, LLC** ▪

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

**programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**

**IMPORTANT**

Des poursuites judiciaries ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet'te citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite avec mention du numero de dossier ci-dessus et du nom des parties nomees ici, si vous souhaitez que le Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du Tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocats, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez do deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au corone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.**

▪ **VICTIM'S VOICE, LLC** ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

3

R.R.,

      Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delaware limited liability company,

      Defendant.

_____/

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

CASE NO. 50-2025-CA-008675-XXXA-MB

# SERVICE OF PROCESS

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

R.R.,

    Plaintiff,

CASE NO. 50-2025-CA-008675-XXXA-MB

v.

CPLG WEST PALM BEACH L.L.C.,
a Delware limited liability company,

    Defendant.

_____/



Date __10/16/25__ Time __2PM__
SMT #285
as a certified process server in the
Circuit and County Courts
in and for the Second Judicial Circuit

## CORPORATE SUMMONS

**THE STATE OF FLORIDA**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this Summons and a copy of the Complaint in this action on
Defendant by serving its Registered Agent:

**CPLG WEST PALM BEACH L.L.C.**
**c/o COGENCY GLOBAL INC.**
**115 N. CALHOUN STREET, SUITE 4**
**TALLAHASSEE, FL 32301**

Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney, Anthony Chiarello
Esq., whose address is:

VICTIM'S VOICE, LLC
100 N. FEDERAL HWY, 4th FLOOR
FORT LAUDERDALE, FL 33301

within twenty (20) days after service of this Summons on Defendant, exclusive of the day of service, and
to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney
or immediately thereafter.  If Defendant fails to do so, a default will be entered against Defendant for the
relief demanded in the Complaint.

WITNESS my hand and the Seal of this Court, this **5TH** day of **SEP** 2025.

XXXXXXXXXX
Clerk of the Courts

By: _____
As Deputy Clerk **JOSIE LUCCE**

▪ **VICTIM'S VOICE, LLC** ▪
100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

## IMPORTANT

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with this Court.  A phone call will not protect you; your written response, including the above case number and named parties, must be filed if you want the Court to hear your case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the Plaintiff's Attorney named above.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway, West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

## IMPORTANTE

Usted ha sido demando legalmente.  Tiene veinte (20) dias, constados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentaria ante este tribunal.  Una llamada telefonica no lo protegera; si usted desea que el tribunal considera su defensa debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesada en dicho caso.  Si usted no contesta la demanda a tiempo, pudies perder el caso y podria ser despojado de sus ingresos y propiedades, or privado de sus deredchos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatements.  Si no conoce a un abogado puede llamar a una de las oficinas de asistencia legal que aparecen en la quia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney." (Demandate o Abogado del Demandadante).

**Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha**

## ▪ VICTIM'S VOICE, LLC ▪

**programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**

**IMPORTANT**

Des poursuites judiciaries ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet'te citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal. Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite avec mention du numero de dossier ci-dessus et du nom des parties nomees ici, si vous souhaitez que le Tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du Tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocats, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez do deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au corone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.**

**▪ VICTIM'S VOICE, LLC ▪**

**100 N. Federal Hwy, 4ᵗʰ Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

3

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

R.R.,

               Plaintiff,

v.

CPLG WEST PALM BEACH L.L.C.,
a Delware limited liability company,

               Defendant.

_____/

CASE NO. _____

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, R.R., by and through undersigned counsel, hereby files her Complaint against Defendant, CPLG WEST PALM BEACH L.L.C., and as grounds therefore states as follows:

## **INTRODUCTION**

1. This is an action for damages in excess of Fifty Thousand Dollars ($50,000.00).

2. This action for damages is brought by the Plaintiff, R.R., a survivor of sex trafficking, under Florida State Law as well as the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter the "TVPRA").

3. R.R. files this civil lawsuit seeking compensation for the harm she suffered when she was forcibly sex-trafficked in a hotel owned, operated, maintained, and controlled by Defendant, it's owners, managers, employees and agents.

4. Defendant, CPLG WEST PALM BEACH L.L.C., (collectively with their managers, employees and agents who, for the remainder of this complaint, always acted the course and scope of their employment and for the benefit of the La Quinta Inn by Wyndham Hotels & Resorts, shall be referred to as the "Harboring Defendant") owned and managed the La

Quinta Inn where Plaintiff, R.R., was trafficked, located 5981 Okeechobee Blvd, West Palm Beach, FL 33417, between September of 2006 and March of 2022; changing its name from LQ West Palm Beach L.L.C. to CPLG West Palm Beach L.L.C. in 2018.

5. The Harboring Defendant, through its owners, operators, managers, supervisors and employees controlled, operated and were responsible for the La Quinta Inn described above where Plaintiff, R.R., was trafficked.

6. As described below, R.R. was forcibly sex trafficked as a direct result of a joint business venture between Plaintiff's sex trafficker and the Harboring Defendant who purposely and knowingly cooperated with and participated in this sex trafficking enterprise. R.R.'s trafficker purposely chose this hotel to sex traffic R.R. because he knew his commercial sex trafficking enterprise would be facilitated by the cooperation of the Harboring Defendant, and by his prior relationship with the Harboring Defendant at the La Quinta Inn hotel.

7. For approximately 6 years, from 2009 through 2015, R.R. just a 16-year-old girl, was repeatedly trafficked for sex at the La Quinta Inn by her trafficker "Zaya" and his associates.

## SEX TRAFFICKING IN THE TVPRA

8. According to the TVPRA "[a]t least 700,000 persons annually, primarily women and children, are trafficked within or across international borders. Approximately 50,000 women and children are trafficked into the United States each year."

9. The stated purpose of the TVPRA is "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."

10. Sex trafficking is defined in the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion or in which the person induced to perform such act has not attained 18 years of age."

11. Recognizing that criminal penalties for pimps and sex buyers were insufficient, Congress passed Section 1591 of the TVPRA which provides a civil remedy against everyone "involved" in the sex trafficking enterprise, specifically including hotels like the Harboring that harbored R.R. for sex trafficking purposes.

12. Under the TVPRA, every entity who knowingly harbors another for a commercial sex act that was provided through force, fraud, and coercion or from any person, or merely induced to provide same from a person under the age of 18 years old, are guilty of sex trafficking; again, this includes the Harboring Defendant's hotel and others like it.

13. Further, any person who knowingly benefits from a commercial sex trafficking enterprise based on forced sex trafficking is jointly and severally liable for the damages arising from said trafficking.

14. R.R. was one of the 50,000+ victims of this form of sex slavery and a victim of sex trafficking within the meaning of the TVPRA.

15. The Harboring Defendant's cooperation with R.R.'s traffickers, as described herein, constitutes a violation of the TVPRA, and R.R. would not have been trafficked without the acts and omissions of Harboring Defendant.

16. R.R. brings this civil action under 18 U.S.C. §1595 seeking recovery for six years of forced sex slavery at the La Quinta Inn, with the cooperation and participation of the Harboring

Defendant.

## **HARBORING DEFENDANT VIOLATED THE TVPRA**

17. Forced sex trafficking of people like R.R. is prevalent throughout the United States because hotels like the La Quinta Inn provide a non-traceable, low-overhead, low-risk commercial enterprise for sex traffickers.

18. Hotels like the La Quinta Inn also provide easy access, anonymity, privacy, and discretion for buyers and, with a hotel's participation, such an enterprise can remain hidden from law enforcement.

19. The TVPRA put the La Quinta Inn on notice of the high likelihood of sex trafficking occurring on their hotel premises.

20. Furthermore, Wyndham Hotels & Resorts (the franchisor of the La Quinta Inn) is a signatory to the Child Protection Code of Conduct ("The Code") established in 2004 (https://thecode.my.salesforce-sites.com/apex/LCRProfile1?country=USA), so it explicitly adhered to a set of codes that put it on notice of R.R.'s sex trafficking; sadly, had it complied with The Code, R.R. would never have been harbored at their hotel.

21. Upon information and belief, the La Quinta Inn had policies and procedures designed to identify and report the obvious signs of sex trafficking, so the Harboring Defendant was well-aware of the violence, manipulation, lies, debt bondage, physical restraint, drugs, and coercion used to force R.R. into sex trafficking.

22. Based on its sex-trafficking policies and a combination of well-documented indicators, the Harboring Defendant knew or should have known that R.R. was being sex trafficked at its hotel, but it chose to ignore these indicators and eschew its own policies; rather, the Harboring Defendant cooperated with R.R.'s Traffickers to traffic R.R. for profit.

23. At all material times, the Harboring Defendant, individually and collectively through its agents, employees, and franchisees, aided, abetted, concealed, confined, benefitted, harbored and profited from R.R.'s sex trafficking at its hotel through a venture with Plaintiff's Traffickers, which caused R.R. foreseeable and catastrophic damages.

## SEX TRAFFICKING VENTURE UNDER THE TVPRA

24. A sex trafficking venture under the TVPRA is the participation in a common sex trafficking enterprise that involves risk and potential profit. (*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021))

25. The Harboring Defendant participated in a common sex trafficking venture with R.R.'s traffickers where, together, they minimized their risks and maximized their profits.

26. The Harboring Defendant maximized profits from increased room occupancy, increased franchise royalty fees, increased property value, on-site food and beverage and condom sales, ATM fees, bribes, kickbacks, tips, drugs, sexual favors and other remuneration brought in by R.R.'s traffickers and the "Johns" that visited the hotel; simply put, participation with R.R.'s Traffickers helped keep the hotel full.

27. In return, the Harboring Defendant created an environment where R.R. could be sex trafficked out of the public view and away from prying eyes of law enforcement; this environment was specifically designed to chill any actions that might interfere with the trafficking of (people like) R.R. at the subject hotel.

28. Harboring Defendant purposely chose not to implement its own sex trafficking policies, educational or training programs, and they purposely chose not to implement policies (or they chose to violate the policies they had) that would have identified, reported, documented, investigated, prevented or ended the sex trafficking at the hotel; this is

especially egregious as its policies were designed to prevent sex trafficking and provide safe lodging.

29. Harboring Defendant willfully created an environment where a sex-trafficking venture flourished, it did flourish, they knew it flourished, and, as a result, R.R. was trafficked at the La Quinta Inn.

30. Furthermore, Harboring Defendant's participation in this this sex-trafficking enterprise was through the acts of its owners, employees, and agents acting within the scope and course of their employment for the benefit of the Harboring Defendant.

31. As a direct and proximate result of the Harboring Defendant's cooperation, willful blindness, negligence, facilitation, malfeasance, and consistent refusals to adhere to common sense policies that would have eliminated human trafficking at the subject hotels, 15-year old R.R. was drugged, starved, beaten, sold, assaulted, abused, and repeatedly raped, in a joint venture between her sex traffickers and the Harboring Defendant at the subject hotels in violation of the TVPRA.

## JURISDICTION AND VENUE

32. This Honorable Court has jurisdiction and venue over this matter because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Palm Beach County, Florida and Defendant's primary place of business was in Palm County, Florida at all relevant times.

## PARTIES

### I.  Plaintiff, R.R.

33. Plaintiff, R.R., is a Florida resident and is otherwise *sui juris*. She may be contacted through her lead counsel, whose information is contained below.

### ▪ VICTIM'S VOICE, LLC ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

34. R.R. is a victim of sex trafficking under the TVPRA because she was harbored, transported, or provided and forced to commit a commercial sex act at the subject hotel located at address described above from 2009 until December of 2015.

35. Given the nature of the case, R.R. is identified in this Complaint by a fictitious name to prevent public disclosure. Plaintiff's counsel has either previously disclosed full names to defense counsel or will do so immediately upon identification of defense counsel.

36. When filing this Complaint, Plaintiff's counsel also filed a Motion for Protective Order seeking Court permission for Plaintiff to proceed anonymously.

**II.  CPLG West Palm Beach L.L.C.**

37. CPLG West Palm Beach L.L.C. is a Delaware limited liability company authorized to do, licensed to do, and was doing business at its principal place of business, in Palm Beach County, in the State of Florida offering the harboring hotel as a place of public lodging; Defendant owned the La Quinta Inn by Wyndham Hotels & Resorts located at 5981 Okeechobee Blvd, West Palm Beach, FL 33417 ("La Quinta Inn") between September 2006 and March 2022.

38. All references to Harboring Defendant include any and all departments, divisions, offices, agencies, subsidiaries, or corporate affiliates, whether domestic, foreign, and/or international. These references also include any and all directors, officers, agents (either with direct/actual or implied/apparent authority), employees, persons, firms, or franchisors, who have taken any action or committed any omission on behalf of Harboring Defendant now or at any time relevant to the claims herein.

39. Any and all references to the actions or omissions by Harboring Defendant (either with direct/actual or implied/apparent authority) are specifically alleged to have been taken or

omitted in the course and scope of said person's employment or agency and for the benefit of the Defendant, and were the kind of services they were employed to perform; their services were provided substantially within both the time and space limits of their employment; and they were motivated, at least in part, by a purpose to serve and benefit their employers.

40. Based upon information and belief, at all relevant times, La Quinta Inn is a motel branded by Wyndham Hotels & Resorts and has been owned and/or operated and/or managed by or through Wyndham Hotels & Resorts, since at least 2006.

41. Harboring Defendant directly participated in a commercial venture that included the harboring and forced trafficking of R.R., therefore becoming a perpetrator of her sexual trafficking under the TVPRA.

42. Harboring Defendant knowingly benefitted from this sexual trafficking enterprise in which they knew or should have known that Plaintiff was being sexually trafficked against her will.

## BACKGROUND AND FACTS

### La Quinta Inn Had Knowledge of Sex Trafficking

43. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Harboring Defendant knew or should have known regarding the forced sex-trafficking of R.R. at the harboring hotel.

44. Today, sex slavery is pervasive in the United States, and hotels are the primary place

where it happens.[1] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[2] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[3] Hotels have been found to account for over 90 percent of commercial sexual exploitation of children.[4]

45. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including La Quinta Inn, on best practices for identifying and responding to forced sex trafficking.[5]

46. Widely recognized signs of forced sex trafficking, which can be observed by hotel staff and which the Harboring Defendant were made of aware of, include but are not limited

---

[1] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking- usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.

[2] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[3] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[4] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[5] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and- Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf.

to:

    a.  Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

    b.  Individuals show signs of physical abuse, restraint, and/or confinement;

    c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e.  Individuals lack freedom of movement or are constantly monitored;

    f.  Individuals avoid eye contact and interaction with others;

    g.  Individuals have no control over or possession of money or ID;

    h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

    i.  Individuals have few or no personal items—such as no luggage or other bags;

    j.  Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

    k.  A group of girls appears to be traveling with an older female or male;

    l.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

    m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

    n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

    o.  Possession or use of multiple cell phones;

    p.  Paying nightly for extended stays with cash; and

    q.  Possession or use of large amounts of cash or pre-paid cards.

47. The Harboring Defendant was aware or should have been aware of these signs of forced sex trafficking when operating and managing the harboring hotel, when enacting and

■ **VICTIM'S VOICE, LLC** ■

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

enforcing policies and procedures applicable to that hotel, and when training, educating, and supervising the staff of said hotel, and when dealing with Plaintiff and her Trafficker.

48. Given the prevalence of forced sex trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to sex trafficking, it is obvious that the decision of a hotel chain to continue generating revenue from sex traffickers without taking reasonable steps to identify and prevent forced sex trafficking in its hotels is purposely made in its own financial interest by facilitating and participating in the forced sex trafficking.

49. Accordingly, many hotels – upon information and belief, including the hotel and franchisor involved in the present suit – have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels. Particularly for those who are signatories of The Code, as described above.

50. Unfortunately for R.R., the Harboring Defendant's promises have proven empty. The Harboring Defendant failed to take any action in response to their actual knowledge of forced sex trafficking, including the forced sex trafficking of R.R. Instead, the Harboring Defendant continued to financially benefit from providing a venue for sexual exploitation of victims, including R.R., who was repeatedly sexually assaulted, again and again, for 6 years at the La Quinta Inn.

**R.R. Was Forcibly Sex Trafficked at the Harboring Defendant's Hotel**

51. R.R. is a survivor of human sex trafficking, and her life story reads like a tragedy.

52. In 2009, R.R. met "Zaya" through mutual friends while she was still attending high school. R.R. was fifteen years old.

53. For approximately 6 years, until late 2015, R.R. was forced to be a sex slave in a sex

trafficking venture between Harboring Defendant and her Trafficker, while being serially harbored at the La Quinta Inn.

54. Not uncommon for teen girls, R.R. grew up with a strained relationship with her parents.

55. In 2009, R.R. desperately needed money to assist her severely mentally handicapped uncle (who has since committed suicide), and her parents could not afford to help.

56. Zaya sensed R.R. was young, naïve and vulnerable and targeted her for trafficking.

57. Zaya promised 15-year-old R.R. that he could help her get the money she needed to take care of her uncle and would help her however he could.

58. Zaya earned R.R.'s trust by being kind to her, isolating her from her parents, and showing her photos of expensive vehicles and homes to groom her into thinking he could help her earn an extravagant lifestyle.

59. Zaya pressured R.R. into exotic dancing, but she balked at the nature of such a job; then he threatened and beat her, forcing her into a sexual servitude from which she could not leave.

60. Instead of helping R.R., Zaya brought her to the La Quinta Inn, took her phone and her other possessions, restrained her, imprisoned her, drugged her, raped her, threatened her, beat her, and announced she would now be working for him and his associates (collectively, "Zaya"). He forced her to work as his sex-slave, forcing her to perform commercial sexual acts with strangers and kept all the money, leaving R.R. totally captive, drugged and dependent on him, with no means of escape.

61. During this time Zaya controlled every aspect of R.R.'s life: he took away most of her possessions, including her money and ID; he restricted her access to food, hygienic necessities, clothing, and sleep; he turned her into an object of commerce by forcing her to wear a sexually explicit "uniform" of his choosing marking her as a sex slave who was

always "on the clock"; he threatened her with extreme violence and death if she refused to comply with the sexual demands of complete strangers or if she attempted to disobey him; he drugged her; he constantly surveilled and physically restrained her; he would not let her speak on a phone without his supervision; he would tightly grip her wrist and forcibly escort her to and from the Harboring Defendant's hotel rooms and, simply put, he forced her to be a subhuman slave he sexually exploited for his own profit with absolutely no regard to her wellbeing or her humanity, as long as she continued to turn a profit for him.

62. R.R. was sexually assaulted thousands of times while at the subject hotels, including by Zaya, and by the Harboring Defendant's owners, managers, employees and/or agents.

63. For 6 years R.R. was merely a sexual object - bought, sold and sexually abused by anyone who paid; this has permanently and catastrophically altered R.R.'s life.

64. As can be reasonably expected, the indicia of being forcibly sex-trafficked, every day, *for 6 years*, were omnipresent, open and obvious to the Harboring Defendant.

65. The Harboring Defendant was trained to identify the open and obvious signs that R.R. was being forcibly sex trafficked and had crafted policies to report sex trafficking, as a signatory to The Code, as described above. Incredulously, the Harboring Defendant willingly participated in this venture with R.R.'s trafficker, Zaya, so it eschewed its own policies, refused to report what they saw and gladly profited from its own participation in Zaya's sex-trafficking of R.R.

66. The omnipresent signs of R.R.'s trafficking included:

   a. 16 year-old R.R. was forced to perform commercial sex acts through force, fraud, and coercion, through physical and mental abuse, and by threatening her with harm to herself and her family, and by referencing other individuals Zaya had previously hurt;

b.  Zaya frequently yelled at R.R. and physically shoved or jerked her around, often in front of Harboring Defendant including stating he would "beat her skull in";

c.  Zaya either paid or forced R.R. to pay for the rooms in her name; Harboring Defendant rented to R.R. even though she was clearly under 18 and its policies forbade renting to obvious minors;

d.  R.R. and/or Zaya were allowed to consistently pay for rooms with cash or prepaid credit cards over a 6-year period, sometimes refused to provide identification and always paid daily, even during extended stays, even though industry standards and their own policies disapproved of such payments;

e.  R.R. checked into and out of the subject hotels with no purse, limited possessions, no luggage, a small backpack at most, no toiletries and no other items that a hotel guest would normally possess when checking into a motel, especially for an extended stay – sometimes for weeks or months at a time;

f.  R.R. rarely had her ID (it was kept by Zaya);

g.  The Harboring Defendant's owners, managers, employees and/or agents could see that Plaintiff was extremely young to frequently be seen with random men significantly older than her;

h.  At check-in R.R. was frequently bruised, disheveled, dressed in sexually suggestive clothing/ lingerie, and under Zaya's physical grip and control; she did not make eye contact with the Harboring Defendant and was often crying;

i.  R.R. was always dressed in her "uniform" which was sexually explicit and inappropriate for her age, the weather, and the public spaces around the hotel, and had limited access to any other clothing;

j.  Harboring Defendant interacted with and permitted R.R. to solicit men for sex near the front desk and in other public spaces around the hotel while they were present, usually while in her "uniform";

k.  Harboring Defendant ignored R.R.'s visible signs of torment and abuse, including malnourishment, poor hygiene, fatigue, sleep deprivation and signs of drug use, cuts, scrapes, scratches, welts, red marks, bruises, split lips, black eyes, patches of missing hair, cigarette burns, and other such physical signs of physical and psychological abuse;

l.  R.R. frequently left blood in her hotel room from beatings by Zaya and the staff never reported same, Harboring Defendant never asked Plaintiff if she was OK and ignored multiple solicitations by R.R. for help;

m. Harboring Defendant was within earshot of R.R. many times when she was moaning from pain, crying, or asking for help;

n. Housekeeping witnessed "Johns" fleeing from a room after physically assaulting R.R., but ignored her solicitations for help as she ran from the room bleeding and with torn and missing clothing;

o. On several occasions R.R. ran into the lobby or accosted Harboring Defendant and asked to use the telephone or call the police so she could escape Zaya, but she was always refused assistance;

p. R.R. would frequently exit the hotel lobby crying or despondent while with Zaya.

q. The Harboring Defendant's owner, managers, employees and/or agents would hear sounds of abuse, physical violence, screaming, and crying coming from R.R.'s room, sometimes involving R.R.'s punishment for attempts to escape her captivity or between R.R., Zaya and "Johns";

r. R.R.'s demeanor showed obvious signs of fear and anxiety, she was always visibly nervous, despondent and afraid when interacting with Harboring Defendant;

s. R.R. was not allowed to communicate with Defendant's employees without Zaya present, was not allowed to sign in, was not allowed to have a key to her room, and was not allowed to pay for her room without Zaya present;

t. R.R., frequently showed signs of disorientation and impairment from being kept in a drugged state by Zaya;

u. R.R. was physically restrained by Zaya (often forcibly jerked by her arm) in front of the Harboring Defendant, frequently when entering or leaving the hotel;

v. Harboring Defendant often made faces or rolled their eyes in disgust at R.R. and mocked her as she was escorted on and off the property under physical restraint by Zaya in plain view of them;

w. Harboring Defendant witnessed that R.R. was constantly monitored by Zaya when she was in the lobby, public spaces and coming in and out of rooms;

x. A constant stream of men – 15 or more per day – came and went from R.R.'s rooms staying only for a short period, often through the lobby in clear view of Harboring Defendant, without luggage or possessions; surveillance cameras captured the visits. Over the course of 6 years that was thousands of short-term visitors to this obvious minor's room for 20 minutes at a time;

y. Zaya forced R.R. to decline housekeeping and rarely allowed Harboring

Defendant into the room that they rented on a night-by-night basis;

z. On the occasions Harboring Defendant observed R.R.'s room it showed signs of sex trafficking – sex and drug paraphernalia, condom boxes, condoms in the trash cans, messy, unclean from denying housekeeping for long periods;

aa. R.R. and Zaya constantly needed additional towels and sheets at all times of the day or night and could be seen taking out their own trash; sheets consistently soiled with blood and bodily fluids were given to Harboring Defendant;

bb. During the time period R.R. was trafficked at the subject hotels, her trafficker and "Johns" frequently used the on-premises ATM and exhibited no signs that they were hotel guests, such as having any luggage or bags;

cc. Zaya loitered in the Harboring Defendant's parking lots all day and night while R.R., and "Johns," made frequent trips to Zaya's vehicle throughout the night;

dd. Zaya had suspicious individuals loitering with him while trafficking R.R. who seemed inappropriately aged to be around R.R.;

ee. Zaya openly paid for assistance from hotel management, ownership and staff;

ff. The Harboring Defendant received a share of the Zaya's profits as tips, bonuses, sexual favors, bribes, kickbacks, drugs and other remuneration for the use of the hotel, wi-fi, towels, sheets, and for acting as lookouts and informants as part of the sex trafficking enterprise;

gg. The Harboring Defendant acted as informants and lookouts in the course and scope of their employment and for the benefit of their employer; specifically, they warned Zaya when law enforcement was approaching, or other customers were complaining so he could conceal R.R.'s trafficking;

hh. The Harboring Defendant frequently informed Zaya when R.R. attempted to leave the hotel property;

ii. R.R. overheard Harboring Defendant directing employees to "double check" for cops, or that police were on the way and to warn Zaya;

jj. R.R. saw Harboring Defendant warn Zaya when there was too much activity coming from the rooms where she was trafficked (or police were coming or complaints came in), and relocated her to a more secluded portion of the hotel – to avoid detection of their trafficking enterprise;

kk. Police frequently came to the hotel to investigate allegations of prostitution and other crimes, but Harboring Defendant would warn Zaya of the police's

(impending) arrival, and denied Zaya's trafficking of R.R. when asked about such activities by authorities;

ll. Zaya openly operated the sex trafficking enterprise and openly carried weapons at the Harboring Defendant's premises;

mm. The rooms where R.R. was forcibly sex trafficked were sometimes located close enough to the lobby that trafficking activities were clearly visible;

nn. Harboring Defendant allowed Zaya to "back in" to parking spaces so his license plate was difficult to read in an effort to avoid detection and identification by law enforcement even though this was against policy;

oo. Zaya had prior dealings with the Harboring Defendant involving forced sex trafficking, which were reinstated when he started trafficking R.R.;

pp. For years Zaya had a sex trafficked enterprise with the Harboring Defendant at the subject hotel prior to R.R.;

qq. Based on actions and communications between Zaya and Harboring Defendant, Zaya was a repeat customer, even at the initial check in;

rr. Zaya chose to traffic R.R. at the subject hotels because of prior dealings with the Harboring Defendant and knew he could operate the sex trafficking enterprise "safely" at these hotels;

ss. R.R. heard Zaya state that he knew personnel at the subject hotels and there would be no trouble there;

tt. Harboring Defendant continuously renewed its business relationship with Zaya over a six-year period by re-renting rooms to him despite its actual and constructive knowledge that R.R. was being trafficked by Zaya;

uu. R.R. overheard the Harboring Defendant say things to Zaya along the lines that prostitution was bringing in a lot of money.

vv. By renting a room to R.R.'s trafficker, Defendant was knowingly associating with him in forcing R.R. to serve their business objectives.

ww. There was a booming sex trafficking industry at the subject hotel before and during the time that R.R. was trafficked at said hotel;

xx. The Harboring Defendant showed indifference to R.R.'s obvious physically troubled condition;

yy. The subject hotel was in an area known to be used for drugs, trafficking, and prostitution;

zz. Zaya conducted multiple illegal drug sales throughout the day at the subject hotels in adjoining rooms or in the parking lot;

aaa. Harboring Defendant failed and refused to hire security personnel to curb the sex trafficking at the subject hotels;

bbb. Harboring Defendant failed to post legally mandated anti-trafficking signs and notices at the subject hotels;

ccc. Harboring Defendant controlled the training, policies, protocols, rules, and guidelines at the subject hotel. Given the availability of training materials from the American Hotel Lodging Association, ECPAT-USA, and other resources, the Harboring Defendant knew or should have known of the "critical role" that the hotel industry plays in "enabling" the sex trade, and of the "widespread national epidemic of hotel/motel sex trafficking." Despite that, the Harboring Defendant failed to adequately implement education, training, and policies to prevent sex trafficking at their hotel. Because of the Harboring Defendant's failures, R.R. was repeatedly victimized and trafficked for sex on the subject hotel's premises; and

ddd. Harboring Defendant "knowingly benefited" from R.R. being sex trafficked because it received payment for the rooms rented to individuals it knew or should have known were engaged in sex trafficking. It also financially benefitted from payments received for Zaya's use of hotel Wi-Fi, which enabled the subject sex trafficking to occur, as Zaya advertised R.R. on multiple trafficking websites, none of which were blocked.

67. Not only was R.R.'s forced sex trafficking open and obvious, but the Harboring Defendant and its employees were uniquely positioned to observe its signs, should have observed its signs and they did observe its signs. Additionally, Harboring Defendant constantly monitored guest activity on the premises and was well-trained to identify and report any sex trafficking, which they willingly chose not to do.

68. In fact, the Harboring Defendant's employees had conversations with R.R., observed her entering and leaving the premises, observed her in the lobby area, and directly interacted with her. They frequently reacted to R.R.'s presence in the hotel either with social cues

of disgust, such as eye rolling, frowning, head shaking, or making derogatory statements under their breath, or with knowing and salacious statements, leering, or salacious comments regarding sex or Plaintiff's availability for sex, and/or bartered, paid for or were rewarded with forced sex directly with her as payment for look-out services, room rentals, or as a share of profits.

69. The open and apparent nature of R.R.'s forced sex trafficking activity is confirmed by the fact that multiple guests made complaints and wrote bad reviews about sex trafficking activities. For example, multiple guests indicated they had made complaints to R.R. in passing and in publicly available reviews include the following excerpts against the Harboring Defendant:

   a. "brothel and I am shock to see that it is apart of a big corporation like Wyndham and is not representing the brand well."

   b. "The management was letting drug dealers sell drugs openly!"

   c. "... the neighborhood is a little rough. Hookers are using it as a base of operations, and the old-style outdoor hallway layout puts all this action right outside your front door."

   d. "I reported this to the manager and asked that repairs be made. This was the first time I've every shortened my stay with LaQuinta and I feel like I should be reimbursed for feeling threatened by the men that looked like pimps, repo truck taking a car of a family who apparently has been living there."

   e. "However, the clientele was very scary. There were prostitutes and other nasty looking people staying at the hotel... It was very obvious. I would have rated the hotel higher if it wasn't for the clientele."

    f.  "Upon arriving we didn't feel safe, working girls walking the halls and people in groups hanging and doing what looked to be drug deals!"

    g.  "Prostitution, black mold, urine. All for the low price of $200/night! Prostitute at the front door soliciting, black mold on the ceiling, urine on the tub and toilet, smelled like old socks inside the room and feces/marijuana outside the room, someone has their room desk outside their room in the hallway. Incredibly unsafe and absolutely disgusting."

    h.  "Overall poor experience due to smell inside the room and loitering of drug users and prostitutes in the hallways."

70. While actively participating in this sex-trafficking venture with her traffickers Harboring Defendant was acting in the course and scope of their employment specifically and explicitly for the benefit of their employers and of the hotel.[6]

71. The actions and knowledge of the Harboring Defendant, taken within the course of their employment for Defendant's benefit, are imputed to the Harboring Defendant. *Doe v. Hotels*, 2024 WL 2955728, at *5.

72. Additionally, R.R. witnessed clear signs of forced sex trafficking of other victims that the Harboring Defendant knew or should have been aware of:

    a.  R.R. saw other sex traffickers and their victims openly operating and being forcibly escorted to and from the rooms by other traffickers at the subject hotels during the time that she was being trafficked at Harboring Defendant's property;

    b.  R.R. saw at many other sex traffickers and their victims openly operating at the subject hotels during the time that she was being trafficked at Defendant's property;

---

1.  [6] The TVPRA permits agency liability. *Doe v. Hotels*, 2024 WL 2955728, at *5 (M.D. Fla. 2024) (citing *Treminio v. Crowley Maritime Corporation*, 649 F.Supp.3d 1223, 1232 (M. D. Fla. 2023), 649 F. Supp. 3d at 1232 (collecting cases and declining to dismiss TVPRA claim against corporation for violative acts of its employees)). An employer can be held liable for the tortious or criminal act of an employee if the act was committed during the course of employment to further a purpose or interest of the employer. *Id.* (citing *Doe v. St. John's Episcopal Par. Day Sch., Inc.*, 997 F. Supp. 2d 1279, 1287–88 (M.D. Fla. 2014)).

c. R.R. believes she was just one of many other sex trafficking victims similarly trafficked at the subject hotels during the same time;

d. R.R. met other sex trafficking victims at the subject hotel, some who appeared to be minors during the time that she was trafficked there;

e. R.R. witnessed other victims in their sexually explicit "uniforms" loitering around the subject hotels in plain view of the Harboring Defendant with visible signs of coercion (cuts, abrasions, bruises, bandages, etc.);

f. R.R. witnessed other victims in plain view of the Harboring Defendant strung out on drugs;

g. R.R. witnessed other victims in plain view of the Harboring Defendant looked exhausted and haggard due to forced sex work at all hours of the day for many days at a time;

h. R.R. witnessed other victims in plain view of the Harboring Defendant in their "uniforms" inappropriately for the location and weather;

i. R.R. witnessed other victims making repeated trips to the parking lot to deposit cash with traffickers, in plain view of the Harboring Defendant, often the traffickers had much nicer vehicles than you would expect at a budget hotel;

j. R.R. witness other victims with obvious "Johns" traveling in and out of the hotel rooms in plain view of the Harboring Defendant's owner, managers, employees;

k. R.R. witnessed other victims and their traffickers propping open doors, and she noticed doors propped open after hours so "Johns" might have easier access.

73. The Harboring Defendant certainly knew or should have known that R.R. was being forcibly sex trafficked on their property. In fact, they wittingly participated in this venture by harboring R.R. for sex trafficking, ignoring the obvious signs and purposely eschewing their own policies to increase their profits.

**R.R. was Harbored as Part of Sex Trafficking Enterprise**

74. Zaya and the Harboring Defendant participated in a sex trafficking enterprise that worked like this:

a. Zaya booked a room at Harboring Defendant's hotel requesting a specific type of room–either in the trafficking wing, secluded from the rest of the guests, or with sight lines to the road so law enforcement can be easily spotted (a clear sign of sex trafficking and a dog whistle for the Harboring Defendant that Zaya had a prior relationship there) (this would be done upon check-in if the first night was rented online or through a corporate website);

b. Zaya posted internet ads for R.R.'s commercial, sexual availability using hotel Wi-Fi from his "burner" phone, typically from the parking lot. "Johns" would call, R.R.'s price was negotiated, and the "John" was sent to the room;

c. The "John" was either met in the lobby and escorted to the room; the "John" would request R.R.'s room number from hotel staff; or the "John" would otherwise be directed to R.R.' room (10-15 "Johns" per night, 20-minute stays to the same room is a clear sign of trafficking);

d. The "John" paid R.R. for the commercial sex act in the room, the act was consummated, and the "John" would leave. R.R. then exited the room, ran to the parking lot and deposited the cash with Zara was loitering in his car in the lot (clear signs of trafficking);

e. While R.R. performed sex acts with the "John," Traffickers loitered in the parking lot of the hotel, often in a luxury vehicle with aftermarket modifications, which doubled as his office, where he ran the trafficking enterprise (clear signs of trafficking);

f. During the busiest hours of the evening, hotel staff looked out for law enforcement, and disturbances or complaints by other guests, warning Zaya or R.R. of same so the enterprise would not be disrupted (awareness of trafficking);

g. Sometimes, based on tips or suggestions from Harboring Defendant, R.R.'s room would be relocated (clear sign of trafficking);

h. In the morning, Zaya used cash from the previous night's trafficking as payment to rent the room(s) for just one additional night so R.R. could again be sex trafficking on an ongoing basis, and sometimes tips would be presented to Harboring Defendant at this time; this process would be repeated over and over even during long-term stays at the harboring hotel (clear signs of trafficking);

i. R.R.'s Traffickers also engaged in the commercial sale of illegal drugs on premises with sales taking place either in the hotel room or in public areas of the hotel often to hotel staff;

j. Zaya routinely stayed at the subject hotels for consecutive weeks but always only paid for one night at a time (a clear sign of sex trafficking);

k.  R.R. and Zaya would have little to no luggage or personal possessions for extended stays and she always wore her "uniform" (a clear sign of sex trafficking);

l.  R.R. was confined her room for long periods of time, but would occasionally loiter on property soliciting Johns when the occasion arose and she rarely was seen leaving the premises, and without Zaya or another, often significantly older handler at least closely observing her (a clear sign of sex trafficking);

m.  R.R. and Zara's rooms consistently displayed "Do Not Disturb" signs on the doors to the room where the Plaintiff was engaged in commercial sex acts often for weeks at a time (a clear sign of sex trafficking);

n.  "Johns" frequently entered and left R.R.'s room at all times of day and night – typically 10 to 15 times a night (a clear sign of sex trafficking) – and they never had luggage, bags or any indication they were guests;

o.  After a few weeks of safe harbor and cooperation from the Harboring Defendant, Traffickers would take R.R. to a new property temporarily, only to return shortly for another extended stay in the safe confines of the present hotel.

p.  16-year-old R.R. was forced to be a sex slave for 6 years of her life when she should have been with her family, out making friends and living the life of a teen and young adult; possibly even getting married and having her own family; these are years she will never get back.

q.  The Harboring Defendant aided, abetted, facilitated and encouraged the above activities by warning R.R.'s trafficker regarding police activity, by relocating R.R. to a secluded portion of the Motel to avoid detection by other guests and police, by ignoring Plaintiff's requests for help, by failing to report that R.R. was being forcibly trafficked for sex, and by accepting payment in cash and without identification to conceal Traffickers' illegal activities.

75. For approximately six years R.R. was a sex slave in this enterprise, the routine being repeated with thousands of "Johns," many complaints, contacts between the Harboring Defendant, R.R., and her Traffickers, and yet Harboring Defendant, with all their training, surveillance, observation and expertise chose to participate in the venture for profit rather than intervene on behalf of R.R.

76. Despite many, many indicia of forced sex trafficking taking place every day, openly and obviously, in front of Harboring Defendant, never did it attempt to

identify or report the sex trafficking of R.R. (or anyone else).

77. Local police were cognizant of the foregoing routine and conduct from afar, making it impossible for the Harboring Defendant to be ignorant of what was occurring right in front of them.

78. R.R.'s Traffickers operated with little regard for concealment due to an understanding that the Harboring Defendant would look out for the best interest of their joint sex trafficking venture and warn him of police activity, enabling her Traffickers to operate openly, as he had found a venue where they could conduct their operations without disruption.

79. Sex crimes and human trafficking were reasonably foreseeable to the Harboring Defendant and occurring on their premises, specifically against R.R.

80. Additionally, the Harboring Defendant, individually and/or by their actual or apparent agents, servants, franchisees and/or employees, knew or had constructive knowledge that the sale and usage of illegal drugs were being performed on the premises.

81. Thankfully, through much difficulty; R.R. was eventually able to escape the grasp of her Traffickers and the prison the hotel served as. She escaped her captor/trafficker without any aid or assistance from the Harboring Defendant.

82. R.R. has spent a considerable amount of time attempting to regain the life that was stolen from her by being a forced sex slave.

83. R.R. brings this lawsuit expressly to hold the Harboring Defendant accountable for knowingly benefiting from her sexual trafficking.

## VIOLATIONS OF THE TVPRA

84. Section 1591(a) of the TVPRA criminalizes the actions of anyone who knowingly:

> (1) recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or...in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act[.]

85. Section 1595 of the TVPRA creates two kinds of civil liability: perpetrator liability and participant liability. Since it was first enacted, the statute has allowed the victim to sue "the perpetrator." 18 U.S.C. § 1595(a).

86. The TVPRA provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator[.]" 18 U.S.C. § 1595(a). A perpetrator under § 1595(a) is "someone who has violated the criminal statute." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021). To establish her claim, Plaintiff must therefore allege sufficient facts that KISHANVB violated 18 U.S.C. § 1591(a); *Doe #1 v. Crowley Mar. Corp.*, 2024 WL 1346947, at *7 (M.D. Fla. Mar. 29, 2024).

### COUNT I – CPLG WEST PALM BEACH L.L.C. VIOLATED THE TVPRA AS A PERPETRATOR

87. Plaintiff, R.R., hereby adopts and re-alleges each and every allegation in paragraphs one through eighty-six above and further states:

88. R.R. is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under 18 U.S.C §1595 against any the "perpetrator" of any violation of the TVPRA.

89. Defendant, CPLG WEST PALM BEACH L.L.C., is a perpetrator within the meaning of

18 U.S.C §1595 because they violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored R.R. by renting a room to R.R.'s trafficker and providing him and R.R. with hospitality services despite knowing or in reckless disregard of the fact that R.R. would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the La Quinta Inn.

90. To "harbor" is "to give shelter or refuge to." *Doe v. Hotels*, 2024 WL 2955728 (M.D. Fla. 2024) (citing Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harbor; Safe Harbor, Black's Law Dictionary (11th ed. 2019) ("An area or means of protection")); cf. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 723–25 (analyzing plain meaning of TVPRA provisions by using dictionaries to define terms).

91. Providing lodging to someone for the purposes of obtaining his or her labor or services against his or her will constitutes "harboring" under the TVPRA. *Doe v. Hotels*, 2024 WL 2955728 at (quoting *Mouloki v. Epee*, 262 F. Supp. 3d 684, 698 (N.D. Ill. 2017)); see *United States v. Gatlin*, 90 F.4th 1050, 1060 (11th Cir. 2024) (showing that a defendant "harbors" an individual under section 1591(a) when the defendant allows the individual to stay at the defendant's house (citing *United States v. Mozie*, 752 F.3d 1271, 1286 (11th Cir. 2014)); *Jane Doe K.R. v. Choice Hotels*, 2024 WL 4373374, at *8 (M.D. Fla. 2024) (same).

92. Defendant knowingly harbored Plaintiff with actual knowledge or reckless disregard of the fact that force, threats of force, or coercion would be used to force Plaintiff to engage in commercial sex acts. Defendant is therefore liable for "harboring" Plaintiff under the TVPRA. *Doe v. Hotels*, 2024 WL 2955728 at *8.

93. Defendant had both actual knowledge of R.R.'s forced sex trafficking and actually participated in her sex trafficking.

94. The facts above show that Defendant entered into either an overt or tacit agreement with Plaintiff's traffickers to provide them with rooms, shelter and participation in the trafficking enterprise whereby Plaintiff would be forcibly trafficked for profit.

95. Defendant is a perpetrator within the meaning of 18 U.S.C §1595 because it violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, Defendant knowingly received financial benefit by actively participating in a venture that it knew, or was reckless in not knowing, engaged in unlawful sex trafficking. Specifically, Defendant had an informal, implicit arrangement with sex traffickers, including R.R.'s sex traffickers, whereby Defendant received revenue by renting hotel rooms to these traffickers on an ongoing basis despite knowing, or in reckless disregard of the fact, that these rooms would be used as a venue for the forced sexual exploitation of individuals, including R.R.

96. Further, Defendant through its owners, managers, employees and/or agents, actively assisted, aided and abetted R.R.'s Traffickers, and participated in operating his sex-trafficking enterprise by operating as police "lookouts," by relocating R.R. and her Traffickers to rooms at the La Quinta Inn conducive to forced sex trafficking after other guests complained, by purchasing or bartering for sex with R.R. directly, by aggressively ignoring R.R.'s signs of forced sex-trafficking, and by the other means set forth in the above paragraphs.

97. Further, Defendant had a prior relationship with Zaya in which they were involved in sex trafficking previously, including forced sex trafficking, showing that they knew that Zaya brought her to the harboring hotel for the purposes of sex trafficking.

98. Defendant's violations of 18 U.S.C §1591(a) operated jointly with the other unlawful acts and omissions of Defendant outlined in this Complaint, to cause R.R. to suffer substantial physical and psychological injuries and other harm as a result of being trafficked and sexually exploited.

99. As a direct and proximate result of the above egregious acts of Defendant, R.R. has been permanently injured and damaged physically, emotionally, psychologically, and financially.

WHEREFORE, Plaintiff R.R. demands judgment for damages against the Defendant, CPLG WEST PALM BEACH L.L.C., in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorneys' fees if allowable by law, and such other and further relief as the Court deems just and proper, both in law and in equity. Plaintiff further demands trial by jury as to all issues triable as a matter of right to a jury.

## COUNT II – CPLG WEST PALM BEACH L.L.C. BENEFITTED FROM THE FORCED SEX TRAFFICKING OF R.R.

100. Plaintiff, R.R., hereby adopts and re-alleges each and every allegation in paragraphs one through eighty-six above and further states:

101. Plaintiff was a victim of sex trafficking within the meaning of 18 U.S.C. § 1591 and Defendant, CPLG WEST PALM BEACH L.L.C., was a "beneficiary" of that sex trafficking within the meaning of 18 U.S.C. § 1595(a)(2).

102. Defendant knowingly received a financial benefit from participating in a venture with Plaintiff's Traffickers, even though it knew or should have known that her Traffickers were engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendant is liable to R.R. as a sex trafficking beneficiary under the TVPRA.

103. Beneficiary liability under the TVPRA arises when a defendant "participat[es] in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]." 18 U.S.C. § 1595(a)(2).

104. To establish a TVPRA beneficiary claim pursuant to § 1595(a), the plaintiff must show that the defendants (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA, and (4) that the defendants had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 719.

**Defendant Knowingly Benefitted from Zaya's Sex Trafficking Enterprise.**

105. The first element of a TVPRA beneficiary claim requires a plaintiff to allege that Defendants "knew it was receiving some value from participating in the alleged venture." *Doe #1 v. Red Roof Inns*, 21 F.4th at 724. For this element, the Court is concerned not with whether Defendants participated in a venture, but only with whether Defendants knowingly benefited from the trafficking enterprise – either "financially or by receiving anything of value." *Id.*

106. In the context of a hotel operator, a plaintiff may establish that a defendant knowingly benefited under the TVPRA by "repeatedly renting rooms that defendant knew or should have known were being used for sex trafficking." *Doe v. Hotels*, 2024 WL 2955728, at *7 (citing *A.D. v. Holistic Health Healing Inc.*, 2023 WL 3004546, at *3 (M.D. Fla. Apr. 19, 2023)).

107. A hotel's receipt of revenue from room rentals is a financial benefit from a relationship with a trafficker sufficient to satisfy the first element of the TVPRA standard. See *Does*

*1-4 v. Red Roof Inns, Inc.*, 688 F.Supp.3d 1247, 1253-54 (N.D. Ga. Aug. 10, 2023) (receipt of room rental revenue constituted a "benefit" under § 1595(a)).

108. It has been set forth above in detail that Defendant knowingly received such revenue from Plaintiff's trafficker and knew or should have known that R.R. was being sex trafficked. Plaintiff's Traffickers paid Defendant for the hotel rooms in which Plaintiff was trafficked to men for sex. Traffickers selected the La Quinta Inn as the location where Plaintiff was trafficked and either paid directly for the hotel rooms or forced Plaintiff to pay for the rooms in her name. Traffickers were repeat customers at the hotel and had a prior relationship with Defendant, as discussed above.

109. Further, Defendant received more than simply room rentals as a benefit of Traffickers' sex trafficking enterprise. In addition, Defendant received other financial benefits in the form of food sales, beverage sales, parking fees, condom sales, ATM fees, wi-fi fees, and portions of Plaintiff's traffickers' profits in the form of tips, bribes, sexual favors, and payments, from those persons who were engaging in sex trafficking. Defendant received consistent cashflow from Plaintiff's Traffickers and other traffickers from renting multiple rooms over multiple nights over several months and years.

110. Harboring Defendant knowingly benefited from Plaintiff's trafficking through monies coming in through fees from room rentals, Wi-Fi, parking, on-premises vending, tips, kickbacks, portions of Traffickers' profits, ATM fees, etc., and other benefits such as assurances of consistent occupancy, information gleaned from hotel loyalty programs, attractiveness to other trafficking enterprises, avoiding excessive police attention, etc.

111. There are ample facts described above establishing that Defendant knowingly received revenue from R.R.'s Traffickers with actual or constructive knowledge that she was

forcibly sex trafficked.

**Defendant Knowingly Benefitted from Participating in a Venture**

112. To establish the second element of a TVPRA beneficiary claim, a plaintiff must plead facts to establish that the Defendants knowingly benefitted "from participating in a venture." see *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 724.

113. "Venture" is defined as an "undertaking or enterprise involving risk and potential profit," and participation as "to take part in or share with others in common or in an association." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 724–25. Thus, to plead this element, Plaintiff must allege that Defendants took part in a common undertaking or enterprise with Plaintiff's Traffickers involving risk and potential profit. *Id.*

114. Allegations that a plaintiff's abuser had prior commercial dealings with the operator, which the parties wished to reinstate for profit, establish a hotel operator's participation in a venture with a sex trafficker. *Doe #1 v. Red Roof Inns, Inc.*, 21 F. 4th at 725–26 (citing *Ricchio v. McLean*, 853 F.3d 553, 556–58 (1st Cir. 2017)).

115. Defendant, CPLG WEST PALM BEACH L.L.C., took part in a common venture involving risk or profit with R.R.'s Trafficker as described in greater detail above, including:

    a.  Harboring Defendant provided lodging to Plaintiff's Traffickers for a common goal of the forced sex trafficking and to profit from the forced sex trafficking of R.R.;

    b.  Harboring Defendant, directly rented rooms to people it knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

    c.  Harboring Defendant, had continuing commercial dealings with Plaintiff's Traffickers, including a course of business that involved accepting cash payments for room reservations, looking out for law enforcement on behalf of Plaintiff's Traffickers while R.R. was being forcibly trafficked, moving Plaintiff's Traffickers and R.R. away from the prying eyes of law enforcement when necessary and

providing isolated rooms away from normal foot traffic of hotel guests, but which were easily accessed by sex-trafficking customers by back or side doors, which Defendant, its owner, managers, employees and/or agents would leave unlocked and unmonitored;

d. Harboring Defendant had a continuous business relationship with Plaintiff's Traffickers such that Defendant established a pattern of conduct with said Traffickers;

e. Harboring Defendant associated with Plaintiff's traffickers by facilitating their trafficking enterprise as set forth above, and by facilitating R.R.'s captivity as set forth above;

f. Harboring Defendant ensured that Plaintiff's Traffickers' room rentals were limited to certain areas of the property that were isolated and sequestered, such that the Defendant were aiding in hiding the trafficking from police and others who might report it to the police and was thereby furthering the venture;

g. Harboring Defendant provided discounts and free rooms in exchange for sexually assaulting Plaintiff;

h. Harboring Defendant, shared in Plaintiff's Trafficker's profits, and were given tips and bonuses for being helpful to the Traffickers, sometimes after busy nights or providing information, portions of which were shared directly with Defendant;

i. Harboring Defendant, its owner, managers, employees and/or agents acted as lookouts and informants as part of their scope of duty for the benefit of their employers;

j. Harboring Defendant, purposely crafted a safe environment for the sex trafficking venture by ignoring massive amounts of nightly short-term traffic to R.R.'s room, R.R.'s repeated trips to deposit money to Plaintiff's Traffickers in the parking lot, her pleas to help her escape (including running naked through the lobby and soliciting assistance) and bent its own rental policy by accepting cash for nightly rentals without ID (from an obvious minor).

k. Harboring Defendant observed Traffickers engaging in actions that clearly indicated they were trafficking R.R. (treating her poorly, lacking freedom of mobility, depositing money to Traffickers in the parking lot, paying daily in cash for rooms during extended stays, etc.), and acted to protected the Traffickers and the trafficking enterprise (ignored R.R.'s inappropriate dress, ignored her pleas for help, refused to investigate disturbances or report trafficking to police – even when police inquired, etc.).

116. Defendant had a continuous business relationship with Plaintiff's Traffickers due to their prior sex-trafficking history, which her Traffickers indicated was the reason they returned to the harboring hotel to forcibly sex-traffic R.R., knowing that Defendant, its owners, managers, employees and agents cooperated with and participated in the sex trafficking venture.

117. Harboring Defendant's owner/manager welcomed Plaintiff's Traffickers when they returned to the hotel to begin their sex trafficking enterprise with R.R., making it clear they had prior relations.

118. R.R. had been beaten and raped, and was bruised, cut, marked, emaciated, exhausted, and showed obvious signs of forced sex trafficking when she was first brought to the hotel and first met Harboring Defendant's owner/managers, who ignored her condition when he welcomed Plaintiff's Traffickers back to the harboring hotel; these indicia were visible by Defendant's employees and agents throughout on her confinement at the hotel.

119. Plaintiff's Traffickers had prior commercial dealings with Harboring Defendant in which they sexually trafficked other victims at the hotel in violation of the TVPRA. Plaintiff's Traffickers and Defendant reinstated their prior relationship for profit, and Defendant was aware that R.R. was being used as a sex slave. A hotel operator participates in a venture with a sex trafficker when the trafficker "had prior commercial dealings" with the operator, "which the parties wished to reinstate for profit." *Ricchio*, 853 F.3d at 555; *Doe #1 v. Red Roof Inns*, 21 F.4th at 725.

120. Harboring Defendant did much more than just rent rooms to sex traffickers and observe signs of trafficking. As stated above, there was a booming sex trafficking business at Defendant's hotel. Other traffickers sold girls for sex at the hotel in the timeframe relevant

to R.R.'s being forcibly sex trafficked at the hotel. Plaintiff alone was trafficked to thousands of men during the time that she was captive on the property.

121. Harboring Defendant's owner/managers openly discussed the details of R.R.'s forced sex trafficking in front of her. Zaya never hid the fact that R.R. was being forcibly sex-trafficked from Harboring Defendant's owners, managers, employees or agents, openly abusing her and controlling her in public, forcing her to openly solicit customers on the property, forcibly escorting her to and from the lobby of the hotel in front of Defendant's owners, managers, employees and agents, and openly displaying her with bruises, marks, cuts, and other signs of her confinement and abuse.

122. Moreover, the evidence directly links specific conduct by Harboring Defendant's owners, managers, employees and agents to the advancement of Plaintiff's Traffickers' sex trafficking enterprise. Harboring Defendant assisted her Traffickers by acting as lookouts for them, and by informing them of police activity at the harboring hotel, as well as warning them about guest complaints and high visitor traffic drawing unwanted attention to the sex trafficking enterprise.

123. Further, Harboring Defendant's managerial staff directed its employees to relocate Plaintiff in response to complaints and police to assist her Traffickers in concealing the joint trafficking enterprise.

124. Harboring Defendant's owners, managers, employees and agents permitted R.R. and other victims, who were consistently scantily clad, to solicit sex on premises including in and around the lobby and desk area of the hotel.

125. Harboring Defendant's owners, managers, employees and agents maintained an ongoing relationship with Plaintiff's Traffickers.

126. Harboring Defendant's owners, managers, employees and agents failed to act when they saw R.R. openly beaten, abused, injured, and confined while they were present. Defendant's owners, managers, employees and agents nonchalantly ignored the R.R.'s pleas for help and her visibly battered and bruised condition. They saw Plaintiff's Traffickers physically force R.R. back to her room when she tried to escape.

127. Harboring Defendant participated in the profit of a joint sex trafficking enterprise by keeping its rooms rented rather than sitting vacant, by accepting tips, bribes and bonuses from Plaintiff's Traffickers, and by attracting other sex traffickers who became aware that the harboring hotel was a "haven" for sex trafficking where they could operate without the threat of management interference and with safeguards against police interference. There was "profit" for Defendant and Plaintiff's Traffickers alike. Defendant received consistent cashflow and security from Plaintiff's Traffickers renting multiple rooms for multiple nights over 6 years. And Plaintiff's Traffickers profited from operating in an environment that was hospitable to trafficking – one in which hotel employees would, among other things, not call the police, permit trafficking victims to solicit men in hotel common areas, visit traffickers' rooms to inquire if trafficking victims needed anything, and have sex with trafficking victims.

128. There was also a shared risk for Defendant and Plaintiff's Traffickers, in that police frequently came to the hotel, sometimes to investigate prostitution. Moreover, Defendant took the risk of loss of business due to bad reviews, guest complaints, and damage to the hotel itself from ongoing criminal activity.

129. Defendant participated in a venture where the acts and omissions of its owner, managers, employees and agents served to support, facilitate, harbor, and otherwise further the

Traffickers' sale and victimization of Plaintiff for commercial sexual exploitation by repeatedly renting rooms to Plaintiff's Traffickers who they knew or should have known was engaged in the forced sex trafficking of R.R.

130. The above allegations establish that Harboring Defendant participated in a venture with R.R.'s trafficker under the second element of TVPRA beneficiary liability. See *I.R. v. I Shri Khodiyar, LLC*, 723 F.Supp.3d 1327, 1337-38 (N.D. Ga. 2024); *K.H. v. Riti, Inc.*, 2024 WL 505063, at *3 (11th Cir. 2024); *S.Y. v. Marriott Int'l, Inc.*, 2021 WL 2003103, at *4 (M.D. Fla. 2021).

**<u>Venture Violated TVPRA as to Plaintiff</u>**

131. To establish the third element of a beneficiary claim, "the venture in which the defendant participated and from which it knowingly benefited must have violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725.

132. The venture between Plaintiff's Traffickers and Harboring Defendant engaged in violations of 18 U.S.C. § 1591(a). Section 1591(a) "makes it a crime to 'knowingly' harbor or solicit a person for commercial sex while 'knowing...that means of force, threats of force, fraud, coercion..., or any combination of such means will be used to cause the person to engage in a commercial sex act'" and also "prohibits anyone from knowingly 'benefit[ting], financially or by receiving anything of value' from 'knowingly assisting, supporting, or facilitating a violation of subjection (a)(1)." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725 (citing 18 U.S.C. § 1591(a)).

133. Plaintiff was a victim of human trafficking at the harboring hotel and that her trafficking was the result of an "implicit agreement" between her Traffickers and the harboring hotel owner, managers, employees and agents to facilitate her trafficking through, among other

things, the rental of hotel rooms, acting as lookouts and informers for police activity, actively relocating R.R. to a more concealed area of the hotel to help Plaintiff's Traffickers escape detection of his sex-trafficking activities to guests and law enforcement, and by ignoring Plaintiff's cries for help – these are all actions done by the Harboring Defendant specifically on account of and in awareness of R.R.

134. The venture between Plaintiff's trafficker(s) and Harboring Defendant violated the TVPRA with respect to Plaintiff because:

    a. Plaintiff's Traffickers recruited the Plaintiff to participate in commercial sex acts at the Defendant's hotel by, among other reasons, stating that he would take care of the Plaintiff and then using force, coercion, threats and physical violence to force Plaintiff to work as a sex slave;

    b. Plaintiff's Traffickers and Defendant harbored the Plaintiff at Defendant's hotel for the purpose of forcing Plaintiff to engage in commercial sex acts at the property;

    c. Plaintiff's Traffickers transported the Plaintiff to the Defendant's hotel for the purpose of Plaintiff participating in commercial sex acts at the hotel;

    d. Plaintiff's Traffickers maintained Plaintiff at the Defendant's hotel for the purpose of Plaintiff participating in commercial sex acts at the hotel;

    e. The commercial sex acts occurred at the Defendant's hotel in rooms rented by Plaintiff's Traffickers;

    f. Plaintiff's Traffickers used force, threats of force, fraud, and coercion to cause Plaintiff to continue to participate in commercial sex acts at the Defendant's hotel including beating the Plaintiff;

    g. Plaintiff's Traffickers threatened the Plaintiff with violence against her and her family and used this tactic to cause Plaintiff to engage in commercial sex acts at the Defendant's hotel;

    h. Plaintiff's Traffickers de-frauded Plaintiff by falsely telling Plaintiff that they would take care of Plaintiff, and then forcing Plaintiff to work as a sex slave the Defendant's hotel;

    i. Plaintiff's Traffickers knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited the Plaintiff to engage in commercial sex acts

in the Defendant's hotel that Plaintiff's Traffickers rented from Harboring Defendant;

j.  Buyers came to the hotel to purchase and purchased the "right" to have sex with Plaintiff from Plaintiff's Traffickers, and then the buyers raped her at the Defendant's hotel;

k.  Plaintiff's Traffickers utilized the hotel's wireless internet connection to post advertisements of Plaintiff for the commercial sex acts;

l.  Defendant was aware or should have been aware that R.R. was being forcibly trafficked for sex by Plaintiff's Traffickers at the Defendant's hotel but nevertheless continued to rent rooms to Plaintiff's Traffickers for said purpose;

m.  Other actions to be proven at trial.

135. The third element of beneficiary liability under the TVPRA is sufficiently pled where the complaint alleges that the plaintiff was sex trafficked in violation of § 1591(a). See *A.D. v. Best W. Int'l, Inc.*, 2023 WL 2955832, at *8 (M.D. Fla. Apr. 14, 2023). Plaintiff R.R. has pled those allegations and satisfied the third element of beneficiary liability under the TVPRA.

**Knowledge that Venture Violated the TVPRA as to the Plaintiff.**

136. To sufficiently plead the fourth element, "the defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited—violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725. § 1595(a)(2) imposes liability where a defendant "knew or should have known [that the venture] has engaged in an act in violation of this chapter." Id.; see also *Doe #1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136, 1155 (N.D. Ala. 2022); *Doe v. Hotels*, 2024 WL 2955728, at *5.

137. In this case, Harboring Defendant's owners, manager, employees and agents actively took steps to facilitate Plaintiff's Traffickers' use of the hotel for the forced sex trafficking of

R.R. and worked together with Plaintiff's Traffickers to force her to serve their business objectives of keeping the hotel as fully booked as possible. For example, Harboring Defendant's owner, manager, employees and agents acted as police lookouts; relocated Plaintiff's Traffickers and R.R. to quieter rooms to assist Plaintiff's Traffickers with escaping detection by police or other guests; tailored housekeeping services to provide as little disruption to Plaintiff's Traffickers' sex trafficking of R.R. as possible; permitted R.R. and other girls, all wearing lingerie, to solicit men for commercial sex in the front desk area of the hotel while employees were present and interacted with R.R. and the other girls; solicited R.R. for sex directly; bartered for forced commercial sex with R.R. in exchange for a free room; nonchalantly ignored Plaintiff's marks, cuts, bruises, burns, and injuries; nonchalantly ignored Plaintiff's pleas for help when she tried to escape or requested help to escape; saw Plaintiff grabbed, kicked and forcibly detained by Plaintiff's Traffickers' during her escape attempts and ignored her plight; accepted payoffs from Plaintiff's Traffickers' in the form of drugs, money and sex for acting as lookouts; etc.

138. Further, Plaintiff showed obvious signs of illegal and forced sex trafficking, including being injured, beaten, emaciated, and was obviously drugged. Moreover, other girls were at the hotel at the same time, and before her presence at hotel, and were either underage or likewise showed signs of physical abuse similar to those of R.R.

139. The Harboring Defendant knew Plaintiff was being trafficked for sex as Plaintiff would walk around in her "uniform" and solicit customers on premises including in the lobby and near the front desk. The hotel rooms in which Plaintiff was trafficked, including the sheets, carpet and walls, would sometimes be soiled with blood when she and her Traffickers left. A steady flow of adult men — sometimes 15 in one night — would go in

and out of Plaintiff's hotel rooms each night she was there. One of those rooms was located close to the lobby where all of this could be seen and frequently heard. R.R. and her Traffickers paid in cash daily even during extended stays and knew the staff intimately given the length of their stay(s) and frequency with which they interacted. Given the facts above, Defendant had actual or constructive knowledge that Plaintiff was being forcibly trafficked for commercial sex.

140. The above facts satisfy the fourth element of a knowing beneficiary claim under the TVPRA as to the Plaintiff. See *W.K. v. Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1371 (N.D. Ga. 2023) (finding sufficient evidence of defendants' knowledge of a TVPRA violation where, *inter alia*, commercial sex at the hotel was "obvious" to employees, hotel employees had commercial sex with a plaintiff, and the defendants had an ongoing relationship with plaintiffs' traffickers); *H.B. v. Red Roof Inns, Inc.*, No. 1:22-cv-1181-JPB, Doc. 158 at 18 (N.D. Ga. June 17, 2024) (finding sufficient evidence as to the fourth TVPRA element where hotel employees provided lookout services and assisted in facilitating the trafficking operation).

141. Actual knowledge requires an awareness or understanding of a fact or circumstance. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725. Whereas constructive knowledge is that knowledge which one using reasonable care or diligence should have. *Id.*

142. Here, Plaintiff specifically alleges that Harboring Defendant actually knew and should have known that its undertaking or enterprise with Plaintiff's Traffickers would violate the TVPRA. Therefore, the knowledge element for beneficiary liability is satisfied as the higher standard has been pled.

143. However, the acts set forth above, at the very least, show that Harboring Defendant had constructive knowledge that Plaintiff would be sex trafficked. General allegations of knowledge are sufficient under the TVPRA to meet the knowledge element under the statute. *C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1297 (M.D. Fla. 2021) (citing *Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, LLC, 904 F.3d 1197, 1215 (11th Cir. 2018)).

144. Defendant's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendant had a statutory obligation not to benefit financially or receive anything of value from a venture that it knew, or should have known, engaged in violating the TVPRA.

WHEREFORE, Plaintiff R.R. demands judgment for damages against Defendant, CPLG WEST PALM BEACH L.L.C., in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorney's fees if allowable by law, and such other and further relief as the Court deems just and proper, both in law and in equity. The Plaintiff further demands trial by jury as to all issues triable as a matter of right to a jury.

## CAUSATION AND DAMAGES

145. Plaintiff, R.R., was harbored at Harboring Defendant's hotel where she was seriously and permanently injured as a direct result of the Harboring Defendant's acts and omissions, in that the Harboring Defendant knowingly permitted, harbored and facilitated illegal sex trafficking ventures to take place at the Defendant's hotel whereby the Plaintiff R.R. was routinely and continuously abused, battered, falsely imprisoned, raped, beaten, starved, forcibly injected with drugs and enslaved.

146. Under the TVPRA, Harboring Defendant(s) are jointly and severally liable for all

damages a jury awards to R.R. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

147. More specifically, at all material times, in the quest for profits, the acts and omissions of the Harboring Defendant caused the Plaintiff to suffer:

   a. Forced labor;

   b. Forced confinement without safe means of escape;

   c. Assault and fear;

   d. Sickness, dizziness and headaches;

   e. Cuts, lacerations, abrasions and other physical harm;

   f. Mental anguish, humiliation, exploitation, degradation and mental distress;

   g. Suffocation, battery, sexual assault and rape;

   h. Shock, fright and post-traumatic stress;

   i. Overdose and drug-induced dangers;

   j. Forced (sexual) slavery; and

   k. Invasion of privacy.

148. As a direct and proximate result of Defendant's acts and omissions Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

149. Defendant is jointly and severally liable with Plaintiff's Traffickers and any other non-party actors who participated in the trafficking for the indivisible injuries that the venture proximately caused to Plaintiff.

150. Plaintiff brings each and every claim for damages permissible under the law against the Harboring Defendant, who are jointly and severally liable, for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical

expenses, necessary expenses, and all compensatory, special, actual, general, and consequential damages permissible under the law, including, but not limited to the following actual past, present and future damages:

    a.  Personal injuries;

    b.  Past, present and future pain and suffering;

    c.  Disability;

    d.  Disfigurement;

    e.  Mental anguish;

    f.  Loss of the capacity for the enjoyment of life;

    g.  Loss of earning capacity;

    h.  Lost wages;

    i.  Direct damages;

    j.  Incidental and consequential damages;

    k.  Emotional distress damages;

    l.  Necessary medical expenses;

    m.  Life care expenses;

    n.  Physical pain and suffering;

    o.  Physical impairment;

    p.  Attorneys' fees as allowed by law;

    q.  Costs of this action; and

    r.  Pre-judgment and all other interest recoverable as a matter of law;

151. The injuries and harms that Plaintiff R.R. suffered as a result of the Harboring Defendant's negligent operation of the harboring hotel and failure to make the hotel

premises safe, are of a permanent and/or continuing nature.

152. Each of the forgoing acts and omissions constitute an independent act of negligence on the part of the Defendant, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by the Plaintiff.

## **JURY DEMAND**

153. R.R. requests trial by jury.

WHEREFORE, Plaintiff prays for a judgment against the Defendant and for the following:

1) That process and summons issue requires Defendant to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiff be awarded actual damages in amounts to be shown at trial;

3) Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

4) Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

5) Plaintiff be provided with a trial by jury; and

6) Plaintiff have such other further legal and equitable relief as this Court deems just and appropriate under the circumstances.

DATED this 26th day of August, 2025.

Victim's Voice, LLC
**Attorneys for Plaintiff**
100 N. Federal Hwy, 4th Floor
Fort Lauderdale, FL 33301
Telephone: 754.335.4700
Facsimile: 954.994.0040
Primary email: anthony@victimsvoice.law
Secondary email: vv.001@victimsvoice.law

By: /s/: Anthony Chiarello
Anthony Chiarello, Esq.
Florida Bar No.: 73760

### ▪ VICTIM'S VOICE, LLC ▪

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700